UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUSEUM OF HANDCAR TECHNOLOGY LLC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TRANSPORTATION AGENCY FOR MONTEREY COUNTY, et al.,<br><br>　　　　Defendants. | Case No. 24-cv-08598-EKL<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION IN PART**<br><br>Re: Dkt. No. 22 |

The First Amendment freedom of speech is vital to our nation's democracy. It facilitates the free exchange of ideas and enhances our political and deliberative processes. And the First Amendment right to petition the government for a redress of grievances is the essential means by which the American people protect and vindicate their other constitutional rights.

The Museum of Handcar Technology LLC (the "Museum") claims that it exercised its First Amendment rights when it publicly opposed a planned busway that would remove portions of the historic Monterey Branch Line railway. The Museum contends that the Transportation Agency for Monterey County (the "TAMC") and the City of Marina (the "City") retaliated against it by refusing to renew the contracts that permit the Museum to operate its family-owned business on that railway. The Court reviewed the parties' briefs, heard argument, and ordered supplemental briefing. Based on the current record, the Court finds that the Museum has demonstrated a likelihood of success on its First Amendment retaliation claim against the TAMC, that it is likely to suffer irreparable harm absent preliminary relief, and that the balance of the hardships and the public interest favor a preliminary injunction at this time. Accordingly, the Court GRANTS in part the Museum's request for a preliminary injunction against the TAMC, as discussed below. The Court DENIES as moot the Museum's request for a preliminary injunction against the City.

## I. BACKGROUND

The Museum is a "family-owned and operated business whose mission is to keep the technology of human-operated railroad handcars alive through their manufacturing, exhibition, and education of the public." Compl. ¶¶ 2, 15; *see also* Mason Clark Decl. ¶ 3, ECF No. 27. The principals of the Museum are Todd Clark, "a world renowned railroad enthusiast," and his son, Mason Clark. *Id.* ¶ 15. Mason "is a 2019 graduate of Cal Poly Pomona's Mechanical Engineering Program who designed and built his first railroad handcar when he was only twelve years old." *Id.*; *see also* Mason Clark Decl. ¶ 2.

The Museum has three primary operations. First, it "offers guided handcar tours on a section of the historic Monterey Branch Line" – a railway "that runs between the cities of Castroville and Monterey." *Id.* ¶¶ 2, 16. The tours depart from the Museum's terminal in the City of Marina, and they travel along the railway through Fort Ord Dunes State Park. *See id.* ¶¶ 4, 16. Second, the Museum "offers a virtual museum that provides further information to the public on the history of railroad handcars." *Id.* ¶ 16. Finally, the Museum makes handcars "under the historic Kalamazoo Manufacturing Company label," which the Museum resurrected in 2016. *Id.*

The Museum's operations on the Monterey Branch Line began in July 2021 under a three-month trial lease with the TAMC – the government agency responsible for planning regional transportation projects in Monterey County. *Id.* ¶¶ 6, 17. On November 4, 2022, the TAMC executed a two-year lease with the City of Marina (the "City") that permitted the City to sublease a portion of the Monterey Branch Line to the Museum to continue its operations. *Id.* ¶ 18; *see also* Todd Clark Decl. Ex. A, ECF No. 26 (the "Lease"). The Lease provided that the parties "may renew" for an additional two years upon completion of the original term. Lease ¶ 2. Less than a week later, the City executed a two-year sublease with the Museum. Compl. ¶ 18; *see also* Todd Clark Decl. Ex. B (the "Sublease"). The Sublease provided an optional two-year renewal term, contingent on the City renewing the Lease with the TAMC. Sublease ¶ 2. However, the Sublease also reflected that the TAMC had "future plans" for the leased property. Sublease ¶ 3a. The Museum agreed to vacate the property "without liability to the [City], upon termination of the [Sublease]." *Id.*

2

1  In December 2023, the Museum's principals learned new details about the TAMC's plans
2  for the leased property that caused them great concern. They learned that the TAMC planned to
3  remove approximately two miles of railway on the Monterey Branch Line to construct the SURF!
4  Busway and Bus Rapid Transit Project (the "Project"). *See* Compl. ¶ 20; *see also* Todd Clark
5  Decl. ¶ 5.

6  In the Museum's view, the TAMC lacks the authority to proceed with the Project because
7  it improperly uses funding that was allocated for rail projects. The TAMC originally acquired the
8  Monterey Branch Line in 2003 using funds provided by Proposition 116. Proposition 116
9  authorized a bond of nearly $2 billion – primarily to fund passenger rail projects. Compl. ¶ 10.
10 When the TAMC applied for Proposition 116 funds in 2003, it represented to the California
11 Transportation Commission (the "CTC") that the funding was for the "San Francisco-Monterey
12 Intercity Rail Service project." *Id*. ¶ 12. The CTC approved the project, and the funding was to be
13 used "for right of way acquisition." *Id*. From the Museum's perspective, Proposition 116 funds
14 cannot be used for the Project because it is a bus project, not an eligible rail project. *Id*. ¶¶ 37-40.

15 In January 2024, the Museum raised concerns about the removal of the railway track to the
16 CTC. *See id*. ¶¶ 20, 22. On January 11, 2024, the Museum met with two division directors of the
17 CTC to discuss its concerns. *Id*. ¶ 22; Todd Clark Decl. ¶ 6. In February 2024, CTC management
18 met with the TAMC, and then temporarily froze $25 million in additional Proposition 116 funding
19 for the Project. Compl. ¶ 22; Todd Clark Decl. ¶ 6. On May 1, 2024, the Museum submitted a
20 letter to the CTC arguing that the TAMC was "prohibited from using the Monterey Branch Line
21 for any busway project" because it was acquired using Proposition 116 funds. Compl. ¶ 23; Todd
22 Clark Decl. ¶ 8 & Ex. C.

23 The Museum's opposition to the Project did not earn it any favor with the TAMC.
24 According to the complaint, Todd Muck, the executive director of the TAMC, stated at a public
25 hearing in June 2024: "I've seen that the handcarts folks have actively opposed and tried to delay
26 the public benefit project. So my recommendation to the [TAMC] board would be to not extend
27 their contract." Compl. ¶ 24. In July 2024, the Project suffered another setback when it lost $35
28 million in federal funding. *Id*. ¶ 25. Then, on August 28, 2024, "in a closed-door board meeting

of the TAMC," the TAMC decided not to renew the Lease with the City, thereby preventing the Museum from renewing its Sublease. *Id.* ¶ 26. On September 27, 2024, the TAMC and the City notified the Museum that the Lease and Sublease would not be renewed. *Id.* ¶ 27. The Museum was ordered "to stop operating" on and to "vacate the premises" of the leased property. *Id.*

On November 30, 2024, the Museum brought this action against the TAMC and the City under 28 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. *Id.* ¶ 3. The Museum asserts First Amendment retaliation against both Defendants (Counts 1 and 4) based on the decision not to renew the Lease. The Museum also seeks declaratory relief against the TAMC (Counts 2 and 3).

On December 3, 2024, the City filed an unlawful detainer action against the Museum in Monterey County Superior Court. *See* Museum Req. for Judicial Notice ("Museum RJN") Ex. A, ECF No. 24 at 3-8. The same day, the TAMC filed a separate unlawful detainer action against the Museum and the City in the same court. *See* Museum RJN Ex. B, ECF No. 24 at 26-31. The purpose of the unlawful detainer proceedings is to permit the TAMC and the City to evict the Museum from the leased property. The Museum asks this Court to enjoin both state court proceedings.

## II.     LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

4

1    Under the Ninth Circuit's "sliding scale approach," a preliminary injunction may issue
2 where "serious questions going to the merits were raised and the balance of hardships tips sharply
3 in [the movant's] favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th
4 Cir. 2011). To raise serious questions, the movant's claim must be more than just "plausible."
5 *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 863 (9th Cir. 2022). Rather, the
6 movant must show that it has a "fair chance of success on the merits." *Flathead-Lolo-Bitterroot*
7 *Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (quoting *Republic of the*
8 *Philippines v. Marcos*, 862 F.3d 1355, 1362 (9th Cir. 1988) (en banc)). Under the sliding scale
9 approach, the movant still must show "a likelihood of irreparable injury and that the injunction is
10 in the public interest."[1] *Cottrell*, 632 F.3d at 1135.

## III. DISCUSSION

12   The Museum seeks to enjoin the TAMC and the City "from continuing to prosecute the
13 unlawful detainer proceedings" and "from interfering with [the Museum's] quiet possession" of
14 the leased property. Ex Parte App. at 2, ECF No. 22. The Court first briefly addresses why the
15 Museum's request for relief is moot as to the City, then turns to the Museum's request for relief as
16 to the TAMC. The Court finds that the Museum has satisfied the *Winter* elements as to the
17 TAMC, and that it is entitled to a preliminary injunction. However, the Court will modify the
18 Museum's proposed injunction as described below. *See infra* Section III.F.

### A. Mootness as to the City

20   On April 1, 2025, the City submitted a declaration indicating that "it has determined that it
21 is unnecessary to proceed with the City's unlawful detainer action in light of TAMC's prosecution
22 of its own action." Ortega Decl. ¶ 3, ECF No. 65. Therefore, "on March 28, 2025, the City filed a

---

[1] The Ninth Circuit has observed that the "sliding scale" standard might not apply when the movant seeks a mandatory injunction – *i.e.*, an injunction that orders a party to "take action." *Doe v. Snyder*, 28 F.4th 103, 111 & n.4 (9th Cir. 2022). The Court concludes that the Museum seeks a prohibitory injunction – *i.e.*, one that "prohibits a party from taking action and 'preserve[s] the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (quoting *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988)). The Court notes that no party addressed this issue in its briefing; however, the parties agreed at the motion hearing that the preliminary relief sought here is prohibitory in nature.

1   Request for Dismissal of [its] unlawful detainer action in the [Monterey County] Superior Court,
2   requesting that the court dismiss the action with prejudice.  The clerk entered the dismissal on the
3   same day." *Id.* ¶ 4; *see also* Ortega Decl. Ex. A (reflecting dismissal with prejudice).
4         The City's dismissal with prejudice of its unlawful detainer action moots the Museum's
5   request for a preliminary injunction as to the City.  "A request for injunctive relief remains live
6   only so long as there is some present harm left to enjoin." *Bayer v. Neiman Marcus Grp., Inc.*,
7   861 F.3d 853, 864 (9th Cir. 2017) (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502
8   (D.C. Cir. 1995)).  From this principle, it follows that a request for a preliminary injunction
9   becomes moot once the plaintiff has "obtained the relief he sought." *Hogue v. Yordy*, 796 F.
10  App'x 955, 955 (9th Cir. 2020) (citing *id.*).
11        The Museum has obtained precisely the relief that it seeks against the City because the
12  City is barred from "continuing to prosecute" its unlawful detainer action.  The City's dismissal
13  also moots the Museum's request to enjoin the City from interfering with its quiet possession of
14  the leased property.  The unlawful detainer action was the only means by which the City could
15  legally interfere with the Museum's quiet possession, and the Museum has not produced evidence
16  of any other conduct by the City that could be enjoined.  The Court also finds that there is no
17  exception to mootness because the City's unlawful detainer action is not "capable of repetition, yet
18  evading review." *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1173 (9th Cir. 2002).
19  The City cannot bring another unlawful detainer action on the same grounds because it dismissed
20  its action with prejudice.  *See Bayer*, 861 F.3d at 865 (holding that request for injunctive relief was
21  moot where the challenged conduct cannot "reasonably be expected to recur").
22        Accordingly, the Museum's motion is moot as to the City because the Museum has
23  obtained the preliminary relief it seeks.[2]  The Court now considers the Museum's motion as to the
24  TAMC.

---

[2] For clarity, the Court does not hold that the Museum's request for a permanent injunction, or its requests for other forms of relief, are moot as to the City.  These issues are not currently before the Court by way of this motion.  Additionally, as discussed at the motion hearing, the Museum's request for a permanent injunction contemplates additional remedies, such as an extension or renewal of the Sublease.

6

**B.     Likelihood of Success on the Merits**

A plaintiff's likelihood of success on the merits "is the most important (and usually decisive) [*Winter* element] in cases where a plaintiff brings a constitutional claim[.]" *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). "If a plaintiff bringing [a claim based on a constitutional violation] shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Id*. at 1042. "A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Id*.

Based on the record before it, the Court finds that the Museum has established a likelihood of success on its First Amendment retaliation claim.

**1.     The Museum has shown a likelihood of success on its First Amendment retaliation claim.**

The Museum brings its First Amendment claim under 42 U.S.C. § 1983, which provides a cause of action for civil rights violations. To prevail on a § 1983 claim, the Museum must show (1) "the deprivation of a right secured by the federal Constitution or statutory law," and (2) "that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006). A municipality such as the TAMC may be liable under § 1983 if it "had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation he suffered." *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007) (quoting *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 667 (9th Cir. 2007)). "The 'official policy' requirement [i]s intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."[3] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

---

[3] The TAMC did not raise any issues as to *Monell* liability in opposition to the Museum's motion for a preliminary injunction. In its Order denying the TAMC's motion to dismiss, the Court held that the Museum plausibly alleged that the TAMC board made and carried out an official decision to retaliate against it. *See* Order Denying Mot. to Dismiss at 6, ECF No. 69 (the "MTD Order"). The TAMC has not submitted any evidence to undermine this conclusion.

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. More*, 547 U.S. 250 (2006) (citing *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998)). "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . . It may not deny a benefit . . . on a basis that infringes his constitutionally protected interests – especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), *overruled on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991).

To prevail on a claim for First Amendment retaliation, the Museum must show that: (1) it was engaged in a "constitutionally protected activity"; (2) the TAMC's conduct would "chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or motivating factor" in the TAMC's conduct. *Sanderlin v. Dwyer*, 116 F.4th 905, 910-11 (9th Cir. 2024) (quoting *Index Newspapers LLS v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)). "Once a plaintiff has made such a showing, the burden shifts to the government to show that it 'would have taken the same action even in the absence of the protected conduct.'" *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)).

The first two elements are undisputed at this stage. First, the Museum engaged in constitutionally protected activity when it opposed the Project through advocacy to the California Transportation Commission and in public statements to the press and on social media. Todd Clark Decl. ¶¶ 6-8 & Ex. C (Museum's letter to the CTC); *see Capp v. Cnty. of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019) ("It is well settled that . . . voicing criticism of the [government's] conduct [] is constitutionally protected."). Second, it is undisputed that the TAMC refused to renew the Lease and ordered the Museum to stop operating on the leased property. *See* Todd Clark Decl. Ex. D (letter regarding non-renewal). The loss of a valuable government benefit – especially one that is essential to a person's business or livelihood – is enough to chill a person of ordinary firmness from speaking freely. *See Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003); *see also Perry*, 408 U.S. at 597-98.

8

The Museum has also produced significant evidence to support the third element of its retaliation claim – that its opposition to the Project was a substantial or motivating factor in the TAMC's decision not to renew the Lease.

First, the temporal proximity between the Museum's opposition to the Project from January through May 2024 and the TAMC's August 2024 decision is circumstantial evidence of retaliatory motive. *Bell v. Clackamas Cnty.*, 341 F.3d 858, 865-66 (9th Cir. 2003) (recognizing that temporal proximity between protected activity and an adverse action "can by itself constitute sufficient circumstantial evidence of retaliation in some cases").

Second, the Museum has submitted an audio recording of a public statement made by Todd Muck, the TAMC's executive director, at a June 3, 2024 City council meeting. Mr. Muck stated: "So as my role as the Executive Director, as an advisor to the board who makes the decision, and, and I've seen the handcart[] folks have actively opposed and tried to delay the public benefit project. So my recommendation to the board would be to not extend their contract." Mason Clark Decl. ¶ 8 & Ex. H (audio recording).

Third, and perhaps most significantly, the Museum cites statements by two TAMC board members – City of Marina Mayor Bruce Delgado and Monterey County Supervisor Wendy Root Askew. These statements purport to reflect the views of the TAMC board as a whole.

Mason Clark attests that he had a phone call on August 3, 2024, with Mayor Delgado. In this phone call, Mayor Delgado purportedly stated that the Museum "poked the bear" (*i.e.*, the TAMC) by opposing the Project; that the TAMC will not consider renewing the Lease due to the Museum's opposition to the Project; that the TAMC "feels burned" by the Museum; and that the TAMC blamed the Museum for raising questions about the use of Proposition 116 funding for the Project. Mason Clark Decl. ¶ 10. The Museum has also submitted written statements by Mayor Delgado that are consistent with Mason Clark's summary of the August 2024 call. In an October 2024 thread on the social platform Nextdoor, Mayor Delgado wrote the following statements, which reflect that the TAMC board decided not to renew the Lease in retaliation for the Museum's protected speech:

- "In my opinion, TAMC is evicting handcars for the trouble TAMC perceives handcar owners have caused for TAMC." Todd Clark Decl. Ex. E, ECF No. 26 at 59.
- "Eviction of hand cars would be the same even if SURF [*i.e.*, the Project] doesn't happen. The damage done to relations between [handcar] operator and TAMC would take a miracle to heal." *Id*.
- "Bad blood between landlord and tenant is not surprising given the details of what has been said publicly." *Id*. at 60.
- In response to a question asking "Is there a petition to TAMC and City of Marina we can sign [to support the Museum]?" Mayor Delgado responded: "[P]etition would help but also would repel TAMC further due to perceived headache handcars causing." *Id*. at 61.
- In response to a question asking for clarification regarding what "headache[s]" the Museum was causing, Mayor Delgado responded: "perception by tamc that tens of millions of dollars lost due to mistakes made that handcar ops took to state agencies, insults made by handcar ops on t.v., social media, urging public [to] oppose SURF. All within their rights but terrible for landlord relations." *Id*.
- "TAMC hasn't handled handcar lease termination well but from my inside view I'm not surprised. You poke the bear and bear is not always kind." *Id*. at 63.

Mason Clark attests that he spoke to Supervisor Askew, another TAMC board member, on September 6, 2024. Mason Clark Decl. ¶ 11. According to Mason Clark, Supervisor Askew communicated "that she and the other TAMC board members would not feel comfortable in extending the Lease or having any other lease agreements with [the Museum], even for the northern track that is not needed for the SURF! Project, that [the Museum] needed to do damage control with respect to TAMC, and that [the Museum] needed to live up to all that [it] said to and about TAMC." *Id*. These statements by two TAMC board members provide significant support for the Museum's First Amendment retaliation claim.[4]

---

[4] Although Mayor Delgado's statements reflect retaliatory motive by the TAMC board, they also reflect his own desire to find a solution for the Museum, though not a full renewal of the Lease.

10

Courts have held that isolated statements by one member of a decision-making body are insufficient to establish that the municipality acted with a retaliatory motive. *See, e.g.*, *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1239 (9th Cir. 1994). These cases are distinguishable because the statements in those cases reflected the motivations of just one person, and there was evidence that others acted based on non-retaliatory motives.[5] Here, by contrast, the Museum has offered statements from TAMC's executive director and two members of the TAMC board. These statements purportedly represent information received by the board and the board's collective view that it would not renew the Lease given the Museum's opposition to the Project. Accordingly, the Court finds that the Museum has shown a likelihood of success on its claim for First Amendment retaliation.

### 2. The TAMC fails to rebut the Museum's showing of likely success.

Remarkably, the TAMC has not submitted any evidence to directly rebut the Museum's evidence of retaliatory motive. The TAMC asserts that its board "evaluated many factors in making [its] decision, including but not limited to, the fact that the Monterey Branch Line cannot be leased due to the Project." Opp. at 12-13, ECF No. 37. But the TAMC has not submitted any evidence to show that it decided not to renew the Lease so that the Project could move forward.[6]

---

*See* Mason Decl. Ex. I, ECF No. 27 at 13 (Mayor Delgado: "I agree handcars should stay until SURF is [construction] ready but handcar operation publicly disparaged MST and TAMC which was a bad move especially when as tenant handcars wanted lease extension."). Mayor Delgado's statements are consistent with the City's October 9, 2024 letter to the TAMC seeking a temporary lease extension for the Museum. Todd Clark Decl. Ex. F at 1-2.

[5] *See Kawaoka*, 17 F.3d at 1239 (finding statements made by one city councilmember were insufficient to infer retaliatory motive because there was "no evidence that any other council member acted with discriminatory intent or that the council as a whole took the action with discriminatory intent" and the city articulated "many" legitimate reasons for its action); *see also DoorDash, Inc. v. City & Cnty. of San Francisco*, No. 21-cv-05502-EMC, 2022 WL 867254, at *27 (N.D. Cal. Mar. 23, 2022) ("[N]o other Board member but Supervisor Peskin made any contemporaneous statements suggesting that the removal of the sunset provision was" motivated by retaliation and "the alleged statements by other Board supervisors indicate a motivation that is not retaliatory."); *Neal v. City of Bainbridge Island*, No. 20-cv-06025-DGE, 2024 WL 1717030, at *5 (W.D. Wash. Apr. 22, 2024) (finding that the plaintiff's evidence "at most implicates the motivation of a single councilmember").

[6] Initially, the TAMC failed to submit any evidence regarding the status of the Project. Recognizing that the Project's status is essential to the TAMC's non-retaliatory motive – and the balance-of-hardships inquiry – the Court provided the TAMC an opportunity to submit a sur-reply and supplemental evidence. *See* Min. Entry, ECF No. 53.

11

1    The TAMC has not submitted declarations or other statements from TAMC board members, nor
2    has it submitted meeting minutes, memoranda, or any other contemporaneous record reflecting a
3    non-retaliatory motive for the TAMC's August 2024 decision.
4        Moreover, the circumstantial evidence overwhelmingly illustrates that the Project was not
5    ready to begin construction as of August 2024, when the TAMC decided not to renew the Lease.
6    The City acknowledged this fact in an October 9, 2024 letter to the TAMC board. The City
7    explained that the Museum "has brought thousands of tourists to [the] City as well as the
8    Monterey region," and asked the TAMC to "reconsider extending this lease temporarily so that [it]
9    can have a chance to keep this business that is important to [the] City and especially [the]
10   downtown area." Todd Clark Decl. Ex. F at 1-2. The City observed that construction of the
11   Project "will likely not commence immediately," and that "[w]ithout a lease extension . . . it is
12   likely the handcar business will shut down permanently." *Id*.[7]
13       Consistent with the City's letter, the other evidence in the record reflects that the Project
14   was not ready to begin construction as of August 2024 because the TAMC had not obtained all
15   necessary funding or development permits.
16       First, as of August 2024, the TAMC still needed to obtain nearly half of the Project's
17   overall funding. The TAMC did not receive $21.1 million in necessary funding from the Federal
18   Transit Administration (the "FTA") until January 13, 2025. *See* Todd Muck Decl. ¶ 6a, ECF
19   No. 54-16; *see also* Sedoryk Decl. Ex. M (FTA Award Statement), ECF No. 54-14. And it
20   appears that the TAMC did not receive $25 million in funding from the California Transportation
21   Commission until the end of March 2025. *See* Muck Decl. ¶ 8 (explaining that the CTC was
22   scheduled to consider an allocation request for the funding at its March 20-21, 2025 meeting).
23   The TAMC has not submitted any evidence that it could have proceeded with construction of the
24   Project when nearly half of the funding was outstanding. Additionally, the TAMC has not

---

[7] October 2024 social media posts by Mayor Delgado also corroborate that the Project was not construction ready. *See* Mason Clark Decl. Ex. I, ECF No. 27 at 10 ("[T]he solution appears to be let handcars stay until SURF gets thru delays it is experiencing b4 it can be built."), *id*. at 13 ("I agree handcars should stay until SURF is [construction] ready[.]"), *id*. at 27 (noting delays related to "project redesign to SURF atop the RR 100% of its route instead of only 30%").

1  submitted any evidence that it knew, as of August 2024, when it would obtain all necessary
2  funding.
3    Second, as of August 2024, the TAMC had not obtained all necessary permits to begin
4  construction. Notably, the TAMC had not obtained a coastal development permit from the
5  California Coastal Commission (the "CCC"). The CCC gave conditional approval for the Project
6  on September 12, 2024. *See* Sedoryk Decl. Ex. I, ECF No. 54-10. Moreover, "the CCC permit
7  conditions required a redesigning of the SURF! busway and mitigation measures to ensure
8  compliance." *Id*. As discussed below, the TAMC has not shown that these pre-construction CCC
9  permit conditions have been met. *See infra* Section III.D.
10   In sum, the Museum has submitted direct and circumstantial evidence of retaliatory
11 motive. The TAMC has not rebutted this evidence, nor has it submitted direct evidence of non-
12 retaliatory motive. The circumstantial evidence submitted by the TAMC undercuts the only non-
13 retaliatory motive it proffers – *i.e.*, that the Lease was not renewed because the Project was ready
14 to begin construction. Therefore, the Museum has shown a likelihood that its protected activity
15 was a substantial or motivating factor in the TAMC's decision not to renew the lease.
16   Accordingly, the Court finds that the Museum has shown a likelihood of success on the
17 merits of its First Amendment retaliation claim.[8]

### C. Likelihood of Irreparable Harm

The Museum argues that it will suffer irreparable harm without an injunction, including the loss of First Amendment freedoms and the possible closure of its business, loss of customer goodwill, and loss of significant investments it made restoring portions of the Monterey Branch Line. *See* Todd Clark Decl. ¶¶ 17-19; Mason Clark Decl. ¶¶ 6, 20. Irreparable harm is "harm for

---

[8] The Court has already addressed the TAMC's other arguments in its MTD Order. *See* MTD Order at 9-10 (addressing the TAMC's argument that the Museum's First Amendment retaliation claim is premised on government speech); *id.* at 10-11 (addressing The TAMC's argument that the Museum waived its First Amendment rights in the Sublease). The TAMC has not submitted any evidence to support these arguments in opposition to the Museum's motion for a preliminary injunction. The TAMC also contends that the Museum is not likely to succeed on its declaratory relief claim. Opp. at 17-18. The Court addressed this argument in its MTD Order, too. *See* MTD Order at 11-12. In any event, the Museum does not need to show a likelihood of success on *every* claim in order to obtain a preliminary injunction.

which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). The Museum "must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction." *Cottrell*, 632 F.3d at 1131.

It is "relatively easy" to establish irreparable harm when First Amendment rights are violated: "The plaintiff 'need only demonstrate the existence of a colorable First Amendment claim.'" *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (quoting *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003)); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion))). The TAMC acknowledges this principle. *See* Opp. at 18.

Here, the Court has found that the Museum brings a colorable First Amendment claim. *See supra* Section III.B.; *see also* MTD Order. Additionally, the Museum continues to exercise its First Amendment rights to oppose the Project. *See* Museum Supp. RJN Ex. A, ECF No. 55 (reflecting the Museum's petition for writ of mandate challenging the Project). Therefore, the TAMC's attempts to evict the Museum threaten to chill its ongoing exercise of First Amendment rights. Accordingly, the Court finds that the Museum has shown a likelihood of irreparable harm.

### D. Balance of Hardships and the Public Interest

When a plaintiff's First Amendment rights are violated, the balance of hardships "tips sharply" in the plaintiff's favor. *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)). Likewise, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

The TAMC has submitted little evidence to demonstrate hardship that would result from a preliminary injunction – and not enough to tip the balance in its favor. The TAMC contends that an injunction will increase the costs and further delay the Project's construction, which in turn will delay the public benefits of the Project. The Court addresses these issues in turn.

14

First, as to increased costs, the TAMC submits that, "[p]er estimates provided by the FTA, . . . [the Project] will incur additional estimated costs in the amount of $500,000" if construction does not begin in April 2025.  Sedoryk Decl. ¶ 19, ECF No. 54-1; *see also* Muck Decl. ¶ 12.  However, the TAMC has not submitted the supporting FTA estimates, nor has it offered any explanation as to why these costs will be incurred if construction does not begin immediately.  Additionally, the TAMC's declarations fail to support that the costs will be incurred if the Museum is not *evicted* by April 2025.  As discussed below, it is not clear when the Project will be construction-ready, or whether and when the Museum must be evicted for construction to proceed.

The TAMC also argues that it will incur an additional $15,000 for tree removal costs.  Sedoryk Decl. ¶ 12 ("The costs associated with the tree removal will increase due to the delays by at least $15,000.").  Again, this figure is neither explained nor supported.  The TAMC submitted the original estimate for tree removal costs, *see* Sedoryk Decl. Ex. J, ECF No. 54-11, but did not submit an updated estimate reflecting the increased cost.  In any event, this purported increase in cost is now unavoidable.  The original tree removal estimate assumed tree removal during the September 2024 to January 2025 period, "which is the non-breeding season for many local and migratory sensitive species."  Sedoryk Decl. Ex. C at 3, ECF No. 54-4.  Removing trees during that period would have "reduce[d] the cost associated with biological monitoring during construction, and the potential for work delays or stoppages."  *Id*.  But that period had already passed by the date of the hearing on this motion.  Thus, the purported increased costs will be incurred regardless of whether a preliminary injunction issues.

Second, the TAMC cites delayed construction as a hardship.  But the TAMC fails to answer important questions, including when construction can begin, what construction work requires the Museum to be evicted, and when that work will commence.  The CCC issued a coastal development permit for the Project on September 18, 2024.  *See* Museum Second Supp. RJN Ex. A, ECF No. 59.  The permit is subject to several terms and conditions that must be satisfied "prior to construction."  *Id*. at 2, 5, 7.  For example, the TAMC must submit revised final plans and a construction plan to the CCC executive director for "review and written approval."  *Id*. at 2, 5.  The TAMC must also have a biologist conduct surveys for any sensitive species in the

15

1    area surrounding the Project. *Id*. at 7. The TAMC has not submitted any evidence that these
2    conditions have been met.
3        To the contrary, the evidence in the record reflects that the CCC permit conditions have *not*
4    been met. The Museum submitted an email from the CCC's coastal planner for Monterey County.
5    *See* Todd Clark Decl. Ex. A, ECF No. 58. This email reflects that, as of February 2025, the
6    TAMC has not satisfied the CCC's prior-to-construction conditions. The coastal planner
7    explained: "No prior to construction conditions have been officially cleared," and "[n]o
8    authorization has been given to start construction prior to MST fulfilling the prior to construction
9    conditions."[9] Thus, it is an open question when the TAMC will satisfy all permit requirements
10   that must be met before construction can begin.
11       Additionally, the TAMC has not specified what construction projects require the Museum
12   to be evicted, though it has focused on tree removal and removal of the railway on which the
13   Museum operates. As to tree removal, the TAMC now acknowledges that "the tree removal will
14   not be completed until Summer 2025." Additionally, the TAMC has not shown that the Museum
15   must be evicted for any or all of the trees to be removed. Todd Clark explains that out of the 100-
16   plus trees that need to be removed, "only 16 trees appear to fall in the right-of-way covered by the
17   Lease and Sublease." Todd Clark Decl. ¶ 2, ECF No. 58. This appears to be consistent with
18   evidence submitted by the TAMC. *See* Sedoryk Decl. Ex. J, ECF No. 54-11. Todd Clark also
19   attests that the TAMC and the City "have never asked [the Museum] if they could access the
20   premises to remove the trees, nor have any attempts been made to remove them to date." Todd
21   Clark Decl. ¶ 2. Based on this evidence, the TAMC has not shown that the Museum's continued
22   occupation of the leased property will impede tree removal.

---

[9] The coastal planner observed "that only a portion of the [P]roject is subject to the Commission's CDP, so I cannot speak to the portions of the project outside of that area (*i.e*., Marina & Sand City)." *Id*. It is unclear from the record what parts of the Project are subject to the coastal development permit conditions. However, other materials in the record reflect that it would be "problematic" to start *any* part of the construction phase without satisfying these conditions first. Sedoryk Decl. Ex. I at 29 ("A permit is required for construction of critical project features. . . . Potentially start construction in unimpacted areas without the coastal permit BUT this could be problematic.").

16

As to removing railroad tracks, the record does not contain a current timeline for this work to begin. The TAMC submitted a project timeline from November 2024 that is no longer accurate given missed deadlines for tree removal and satisfaction of the CCC permit requirements. *See* Sedoryk Decl. Ex. A (Project Timeline dated 11/18/24), ECF No. 54-2. Under that timeline, the TAMC expected to *begin* removing or salvaging railroad tracks by August 28, 2025, and to finish by November 14, 2025. *See id.* at 2 row CBW1005. Therefore, it is reasonable to infer that the TAMC will not begin removing railroad tracks until at least September 2025.

In sum, based on the current record, the TAMC has not shown that the Project is ready to proceed, or that it will suffer hardship if the Museum is permitted to continue occupying the leased property while this action proceeds. The Court does not doubt that the Project would bring important public benefits to Monterey County, including a low-cost public transit option for many who live and work there. But the evidence before the Court does not presently show that these public benefits will be delayed by a preliminary injunction. However, the balance of hardships may change with time, and the Court will modify the Museum's proposed preliminary injunction to account for the potential hardships to the TAMC and the public as discussed below.

### E.     The Anti-Injunction Act

In its opposition, the City argued that the Anti-Injunction Act, 28 U.S.C. § 2283, bars the Court from enjoining state court proceedings. City Opp. at 18, ECF No. 36.[10] However, a federal court may enjoin state court proceedings "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Civil rights actions under 42 U.S.C. § 1983 "are among the exceptions to the [Anti-Injunction] Act that have been 'expressly authorized by Act of Congress.'" *Goldie's Bookstore, Inc. v. Super. Court*, 739 F.2d 466, 468 (9th Cir. 2000) (first quoting 28 U.S.C. § 2283; and then citing *Mitchum v. Foster*, 407 U.S. 225, 243 (1972)).

---

[10] The TAMC did not raise this issue, and it did not join the City's opposition. Nonetheless, the Court addresses the implications of the Anti-Injunction Act for completeness.

Because the Museum asserts a viable § 1983 claim, the Anti-Injunction Act does not prohibit the Court from enjoining the state court unlawful detainer proceedings. Given that the Museum's constitutional rights are at stake, and because the Museum has shown a likelihood of success on the merits of its First Amendment claim, the Court finds that principles of federalism and comity do not counsel against an injunction. *See Blalock Eddy Ranch v. MCI Telecomms. Corp.*, 982 F.2d 371, 375 (9th Cir. 1992) ("The decision to issue an injunction that does not violate the Anti-Injunction Act, therefore, is committed to the discretion of the district court.").[11] The Court finds that the Museum has no other recourse to vindicate its constitutional rights in the unlawful detainer action because its retaliation defense has been stricken. *See* Ortega Decl. ¶ 3. Finally, as discussed below, the Court will tailor the injunction to minimize interference with the state court proceeding.

### F. The Injunction

For the foregoing reasons, the Court finds that the Museum has satisfied the *Winter* elements and is entitled to a preliminary injunction against the TAMC. However, the Court finds that a modification of the Museum's proposed injunction is appropriate. "[A] district court is not limited to a plaintiff's proposal and instead 'may enter any injunction it deems appropriate, so long as the injunction is no more burdensome to the defendant than necessary to provide complete relief[.]'" *Day v. Henry*, 129 F.4th 1197, 1202-03 (9th Cir. 2025) (quoting *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017)).

The Court finds that the Museum's proposed injunction is more burdensome than necessary in two respects. First, the Court understands that a trial in the unlawful detainer action is scheduled to begin on April 28, 2025, *see* Ortega Decl. ¶ 3, and thus a stay would disrupt the state court's management of its docket. Second, a complete stay would prejudice the TAMC.

---

[11] The City notes that district courts have held that the Anti-Injunction Act prohibits a federal court from staying state-court unlawful detainer actions. *See* City Opp. at 19. None of these cases involved a § 1983 claim. *See, e.g., Le v. 1st Nat'l Lending Servs.*, No. 13-CV-01344-LHK, 2013 WL 2555556 (N.D. Cal. June 7, 2013); *Farah v. Wells Fargo Home Mortg.*, No. 13-cv-1127-PSG, 2013 WL 1397405 (N.D. Cal. Apr. 5, 2013); *Michener v. Wells Fargo Home Mortg.*, No. C 12-2003 PJH, 2012 WL 3027538 (N.D. Cal. July 24, 2012); *Carrasco v. HSBC Bank USA, N.A.*, No. C-11-2711 EMC, 2012 WL 646251 (N.D. Cal. Feb. 28, 2012).

18

1   Although the balance of hardships and the public interest currently favor an injunction, given the
2   public benefits of the Project, the balance may shift if and when the Project is ready to begin
3   construction. In that event, the TAMC would be required to restart the unlawful detainer action,
4   reserve a new trial date, and conduct the trial. Based on the parties' experience to date, the
5   process of restarting the unlawful detainer action and securing an available trial date could delay
6   the proceedings by two months.

7   Accordingly, the Court will not enjoin the TAMC from prosecuting its unlawful detainer
8   action, and the Court will not enjoin the state court from entering judgment. However, the Court
9   will enjoin the TAMC – including its officers and agents – from seeking, requesting, or applying
10  for a writ of possession based on any judgment obtained in the unlawful detainer action. To be
11  clear, the TAMC shall not seek to enforce any judgment obtained in the unlawful detainer action
12  to evict the Museum from the leased property, nor shall it instruct or direct any other person to
13  enforce such a judgment.

14  Based on the current record, the Museum has demonstrated that the balance of hardships
15  and the public interest favor an injunction. However, the balance of hardships and the public
16  interest may change with time. The TAMC may file a motion to vacate this injunction if it can
17  demonstrate that construction work for the Project will commence imminently, and that the
18  Museum must be evicted before construction can begin. If the TAMC files such a motion, the
19  Court will expect a detailed evidentiary showing that the Project is fully funded; that all required
20  permits and approvals have been obtained; that all pre-construction conditions have been met; and
21  that construction cannot begin unless the Museum is evicted.

22  Finally, the Court will not order the Museum to provide a bond or security pursuant to
23  Federal Rule of Civil Procedure 65(c). "[T]he party affected by the injunction [bears the]
24  obligation of presenting evidence that a bond is needed[.]" *Conn. Gen. Life Ins. Co. v. New*
25  *Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). "The district court is afforded wide
26  discretion in setting the amount of the bond, and the bond amount may be zero if there is no
27  evidence the party [affected by the injunction] will suffer damages from the injunction." *Id*. (first
28  citing *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999); and then citing *Gorbach*

United States District Court
Northern District of California

19

1  *v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000)).  Here, the TAMC did not request security.  And, as discussed above, the TAMC has not demonstrated that it will suffer costs or damages from the injunction at this time.  *See supra* Section III.D.  Accordingly, the Court finds that no security is required.  *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.").

## IV. CONCLUSION

For the foregoing reasons, the Museum's motion for a preliminary injunction is DENIED as moot with respect to the City.  The Museum's motion for a preliminary injunction is GRANTED in part as to the TAMC as follows:  The Court ENJOINS the Transportation Agency for Monterey County – including its officers and agents – from seeking, requesting, or applying for a writ of possession based on any judgment obtained in the unlawful detainer action, Case No. 24CV005108 in Monterey County Superior Court.  The Transportation Agency for Monterey County shall not seek to enforce any judgment obtained in the unlawful detainer action to evict the Museum from the leased property, nor shall it instruct or direct any other person to enforce such a judgment, without further order of this Court.

**IT IS SO ORDERED.**

Dated: April 14, 2025

Eumi K. Lee
United States District Judge