Pages 1 - 96

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Eumi K. Lee, Judge

```
MUSEUM OF HANDCAR TECHNOLOGY,   )
LLC,                            )
                                )
            Plaintiff,          )
                                )
   VS.                          )      NO. 5:24-CV-08598-EKL
                                )
TRANSPORTATION AGENCY FOR       )
MONTEREY COUNTY, et al.,        )
                                )
            Defendants.         )
_____ )
```

San Jose, California
Monday, June 23, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
> DOWNEY BRAND, LLP
> 621 Capitol Mall, Suite 18th Floor
> Sacramento, CA 95814
> **BY: GALEN M. GENTRY**
> **ANTHONY SALABER**
> **ATTORNEYS AT LAW**

For Defendants:
> SKANE MILLS, LLP
> 550 South Hope Street, Suite 410
> Los Angeles, CA 90071
> **BY: HEATHER L. MILLS**
> **ATTORNEY AT LAW**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**I N D E X**

Monday, June 23, 2025 - Volume 1

|  | **PAGE** | **VOL.** |
|---|---|---|
| Closing Argument by Ms. Mills | 61 | 1 |
| Closing Argument by Mr. Gentry | 72 | 1 |
| Closing Argument by Ms. Mills | 87 | 1 |

**PLAINTIFF'S WITNESSES**          **PAGE**    **VOL.**

**RHEINHEIMER, LISA**
| (SWORN) | 12 | 1 |
| Direct Examination by Mr. Gentry | 12 | 1 |
| Cross-Examination by Ms. Mills | 53 | 1 |
| Redirect Examination by Mr. Gentry | 59 | 1 |

**<u>Monday - June 23, 2025</u>**                              **<u>10:20 a.m.</u>**

<u>P R O C E E D I N G S</u>

---o0o---

**THE COURT:**  Please be seated.

**THE COURTROOM DEPUTY:**  We are calling Case Number
5:24-CV-8598-EKL, Museum of Handcar Technology, LLC, versus
Transportation Agency for Monterey County, on today for an
evidentiary hearing on a motion to vacate preliminary
injunction.

Counsel, please come forward and state your appearances on
the record starting with counsel for the plaintiff.

**MR. GENTRY:**  Good morning, Your Honor.  Galen Gentry
from Gummy Brand appearing for the plaintiff Museum of Handcar
Technology, LLC, and my colleague, Anthony Salaber, is here
with me as well.

**THE COURT:**  Good morning.

**MS. MILLS:**  Good morning, Your Honor.  Heather Mills
from Skane Mills on behalf of the Transportation Agency for
Monterey County.

**THE COURT:**  Good morning.

Counsel, would both of you like to introduce the folks at
your table?

**MR. GENTRY:**  So, Your Honor, immediately to my right
at the front, or to my left at the front of the table is Todd
Clark, who is one of the principals of the plaintiff.  The

 1   gentleman behind him is Mason Clark, who is the other

 2   principal.

 3          **THE COURT:**  All right.  Good morning to you both.

 4          **MS. MILLS:**  At the end of the table there is Lisa

 5   Rheinheimer from the MST.  She will be our witness today.  To

 6   her left is Robin Diem, who is a member of my firm but not

 7   counsel of record in this case.  Right there, that gentleman is

 8   Todd Muck from the TAMC.

 9          **THE COURT:**  Good morning to you all.

10       So we had discussed -- well, let me talk a little bit

11   about what I'm expecting from today.  So my expectations, we'll

12   probably go a little bit over two hours, hopefully less than

13   two hours, frankly.

14       I have some preliminary questions for counsel just to get

15   some updates from y'all, and then afterwards I plan to move to

16   the witness examinations.  So, which sounds like that will be

17   Ms. Rheinheimer.

18       Okay.  And to that end, I'm planning to give the museum,

19   of course, an opportunity to ask questions.  Then after that,

20   say approximately 30 minutes, then afterwards any rebuttal, but

21   there's already been declarations and such, probably about 15

22   minutes, and then after that any questions I may have.  I will

23   intercede if I have clarifying questions along the way because

24   I hate being lost in the middle of testimony.

25       We have a remote court reporter today, which is something

1    I was going to tell you all, and a good reminder to myself,

2    which we need to make sure we're actually using our

3    microphones.  Counsel will need to be at the counsel table

4    when -- will need to approach when they're actually questioning

5    witnesses or in addition when you're arguing.

6        So after we do the witness we'll see how we're doing in

7    terms of a break.  We may just plow through and just take a

8    quick five-minute stretch break, do arguments for about 25

9    minutes per side I expect at the most.  Then I'm going to take

10    a brief break, check my notes, and then we're going to wrap up.

11        So that's sort of what I'm expecting.  I'm hoping that

12    we're out of here by 12:30, but we've got a little bit of a

13    later start, so we'll see.  We might push it a little bit

14    later.

15        Is there any questions about sort of where we're headed

16    for today?

17            **MS. MILLS:**  No, Your Honor.

18            **THE COURT:**  Mr. Gentry?

19        **MR. GENTRY:**  So the question was would we just jump

20    right into testimony and then save argument for after?

21            **THE COURT:**  Yes, but I have a couple of questions for

22    both counsel first, so counsel, why don't you go ahead and come

23    up.

24        All right.  So let me begin with TMS TAMC.  Ms. Mills, so

25    I'm confused because, well, I was a little bit concerned

```
 1   because was the witness disclosed to opposing counsel who the
 2   witness would be beforehand?
 3           MS. MILLS:  I think it was, Your Honor, in the moving
 4   papers.  I can find the cite, but in the papers I said that we
 5   would produce the person most knowledgeable from MST at the
 6   hearing, so any questions could be asked of her.  And then we
 7   identified her in a declaration as the person most
 8   knowledgeable.
 9           THE COURT:  Okay.  That took a couple steps of
10   inference.  I wasn't sure who you were going to call.  I
11   assumed it was going to be Ms. Rheinheimer just judging by the
12   substance, but that should have been explicitly more directed
13   to explicitly inform the Court.
14           MS. MILLS:  I apologize, Your Honor.  It was not my
15   intention in try to obfuscate that in any way.  I probably left
16   up to a name I should have put in the papers.  I didn't realize
17   that I left it out specifically.
18           THE COURT:  Okay.  Mr. Gentry, were you expecting it
19   to be Ms. Rheinheimer or did you know?  Were there
20   conversations?
21           MR. GENTRY:  There were no conversations.  I was a
22   little confused, as well.
23           THE COURT:  Okay.
24           MR. GENTRY:  I didn't know whether there might be
25   some other person who was perhaps more knowledgeable than
```

1  Ms. Rheinheimer as to certain items, but at the end of the day

2  presumed that it would be Ms. Rheinheimer.

3        **THE COURT:** It sounds like you went through a similar

4  process as the Court did.

5        **MR. GENTRY:** I think so.

6        **THE COURT:** I just want to touch base with counsel

7  for TAMC because I'm a little concerned. So I saw that there

8  are 30 pages. Well, we started looking at the 30 pages of

9  evidentiary objections filed.

10       **MS. MILLS:** Yes, Your Honor.

11       **THE COURT:** Okay. In a separate document, separate

12  from the reply brief.

13       **MS. MILLS:** Yes, Your Honor.

14       **THE COURT:** Okay. Did you review the Local Rules?

15       **MS. MILLS:** I did, Your Honor. And I have no excuse

16  other than I made a mistake. I was filing papers in central at

17  the same time, which has different rules, and I simply was

18  sleep deprived and I made a mistake. I realize that it was

19  supposed to be in the document. I was not attempting to

20  violate the rules.

21     It was a mistake.

22       **THE COURT:** Okay. Because then I was concerned when

23  it appears to be that TMAC refused to withdraw this set of

24  objections because they are in violation of the rules in

25  conversations with opposing counsel.

1          **MS. MILLS:**  Well, I did, Your Honor, because -- well,

2     for the reasons that I stated to Mr. Gentry.  I obviously

3     believe that the Court has the authority to consider the

4     objections even though they were technically incorrect by

5     filing them in a separate document, which we set forth in our

6     opposition.

7          So I was hesitant to leave out of the record the

8     objections to the evidence that I felt were relevant and

9     important, but -- especially given the fact that there was

10    authority on point that said the Court obviously has the

11    authority to consider the objections even though they were

12    filed in a separate document.

13         **THE COURT:**  This feels like a little bit of

14    gamesmanship when you're talking about basically tripling the

15    length of the reply brief through your objections.

16         **MS. MILLS:**  It was not.  It was honestly, Your Honor,

17    a mistake.  There's no excuse for it other than I was sleep

18    deprived, preparing for a trial and filing documents in central

19    at the same time.  I read the rules, I just forgot.

20         **THE COURT:**  Okay.  And for clarification, because I'm

21    going to say this a bit today is my guess, is what does counsel

22    believe the standard is for evidentiary objections or the

23    submission of evidence?  What rules apply in terms of the

24    preliminary injunction hearing that the Court is going to hear

25    today?

1    **MS. MILLS:**  I assume that the Court is going to hear

2    admissible evidence.  I'm sorry, I don't quite understand the

3    question.  I'm not trying to be cagey, but ...

4          **THE COURT:**  So, I mean, the Federal Rules of Evidence

5    don't apply to the same degree.  They're under consideration,

6    right?  But because as part of a preliminary injunction hearing

7    and for a motion to dissolve, admissibility of evidence is not

8    the same as it would be for trial, right?

9          **MS. MILLS:**  Yes.

10         **THE COURT:**  It goes to the weight versus

11   admissibility.

12         **MS. MILLS:**  Yes.

13         **THE COURT:**  So when there's concern or what you had

14   just stated, the reason I asked this question, you had just

15   stated, well, I'm concerned that inadmissible evidence is going

16   to be considered.  We're not under the same.  So I just want to

17   make sure we're all on the same page in terms of what

18   evidentiary rules do apply and what the Court will be

19   considering because I will undoubtedly at some point today say

20   this goes to weight versus admissibility.

21         **MS. MILLS:**  Understood, Your Honor.

22         **THE COURT:**  Okay.  So the Court is inclined and will

23   -- intends to strike the objection as violating the rules, the

24   local rules, in addition to the -- yeah, in terms of violating

25   the local rules.

1          This does not mean that it does not go to weight versus

2     admissibility.  It does not mean that the Court with everything

3     that is before it today and which already before it in the

4     record and which will be considered today, that I'm not going

5     to be weighing the evidence or considering the admissibility,

6     and in my head as someone as a trial judge, that will go to

7     weight.  If there's a hearsay issue, that's going to go to

8     weight.

9          So is that clear?

10              MS. MILLS:  It is, Your Honor.

11              THE COURT:  All right.  And we can talk about this a

12    little bit more at the end of today's hearing, but I am

13    concerned because there seems to be concern about defendants,

14    you know, being respectful both for judicial resources, as well

15    as in terms of giving a heads-up to opposing counsel and such.

16    I'm concerned that we are verging on there being excessive

17    motion practice which may not be needed or rushed motion

18    practice when we have a very heavy docket here in the Northern

19    District, and when we're rushing around to have to address

20    motions which defendant doesn't file timely for the first

21    hearing date set, it raises concerns.

22         Is that clear?

23              MS. MILLS:  It is, Your Honor.

24              THE COURT:  Okay.  So we're going to talk about that

25    a bit more at the end of today's hearing, but I did want to

1    make clear in terms of sort of evidentiary objections which may

2    come up today, how the Court considering the record, what can

3    be referenced and so forth.  So when we're going through

4    objections, you can go ahead in terms of if some come up today,

5    if they're appropriate you can make those objections just so I

6    note it.  I'm going to say it's going to go to weight versus

7    admissibility likely, but it helps in terms of a little trigger

8    for me for weight.

9         There can be no speaking objections.  Say your word, the

10   rule, move on.  Right?  Don't be -- I'm not even likely, unless

11   it's so out of bounds, will not likely say sustained,

12   overruled, et cetera.  I'll just say noted and move on.  But if

13   it's something which is well out of bounds then I will say

14   something.  But just so the parties, counsel's aware.

15        All right.  So with that and those sort of ground rules,

16   let's go ahead and begin.  So we'll begin with the testimony of

17   Ms. Rheinheimer.  So I'm going to have -- with Mr. Gentry

18   questioning.

19        Ms. Rheinheimer, I'm going to go ahead and have you

20   approach so you can be sworn in and take the witness stand.

21             **MS. MILLS:**  Your Honor, is it appropriate for

22   Ms. Rheinheimer to bring her materials with her that she may be

23   asked about, some of the exhibits to her declaration?

24             **THE COURT:**  They're exhibits?  I'm just wondering

25   what they are.

RHEINHEIMER - DIRECT / GENTRY

1          MS. MILLS:  They're exhibits to her declaration that

2     were provided in support of the motion.

3          THE COURT:  Okay.  Yes.

4          MS. MILLS:  Thank you, Your Honor.

5          THE COURT:  And you'll come around and be in the

6     witness box.

7          Once you place that on the witness box, Madam Clerk will

8     then swear you in, and you'll stand and raise your right hand.

9          THE COURTROOM DEPUTY:  Please raise your right hand.

10                      **LISA RHEINHEIMER**,

11     called as a witness for the Plaintiff, having been duly sworn,

12     testified as follows:

13          THE COURTROOM DEPUTY:  Once you're seated please

14     state your full name and spell your last name for the record.

15          THE COURT:  Good morning.

16          THE WITNESS:  Good morning.  Thank you.

17     Lisa Rheinheimer.  That's R-h-e-i-n-h-e-i-m-e-r.

18          THE COURT:  Counsel, you may begin.

19                      **DIRECT EXAMINATION**

20     BY MR. GENTRY

21     Q.   Okay.  Good morning, Ms. Rheinheimer.

22     A.   Good morning.

23     Q.   Before we dive in, could you just explain a little bit

24     about your educational background?

25     A.   Sure.

RHEINHEIMER - DIRECT / GENTRY

 1          I have my undergraduate degree from the University of New

 2     Hampshire in environmental conservation with an environmental

 3     policy focus.  I have my master's degree in public

 4     administration from Golden Gate University.

 5     **Q.**   Okay.  Thank you for that.

 6          Are you a biologist?

 7     **A.**   No.

 8     **Q.**   Okay.  Are you an engineer?

 9     **A.**   No.

10     **Q.**   Are you a licensed contractor?

11     **A.**   No.

12     **Q.**   So is it fair to say that if you were trying to draw a

13     conclusion about something that is uniquely within, say,

14     biologist's area of expertise, you would need input from the

15     biologist in order to draw such an --

16     **A.**   Yes.

17     **Q.**   Okay.  And in the course of your duties as a -- so what is

18     your position with the NSP?

19     **A.**   I'm the deputy CEO.

20     **Q.**   Okay.  So in the course of your duties as the deputy CEO,

21     to what degree are you responsible for the administration of

22     the SURF+ project?

23     **A.**   I'm the primary project manager for MST on the SURF!

24     Busway and Bus Rapid Transit Project.

25     **Q.**   Okay.  So you interact with a lot of -- a lot of parties

1   in interest; is that fair to say?

2   **A.**   Yes, that is fair to say.

3   **Q.**   Like biologists?

4   **A.**   Correct.

5   **Q.**   Contractors?

6   **A.**   Yes.

7   **Q.**   Engineers?

8   **A.**   Yes.

9   **Q.**   Okay.  You signed the declaration in support of the

10  transportation agency for Monterey County's motion to vacate

11  the injunction; is that correct?

12  **A.**   Yes.

13  **Q.**   Okay.  And you signed that on or around May 12th, correct?

14  **A.**   Well, I signed two of them.  So --

15          **THE COURT:**  So Ms. Rheinheimer, I'm going to ask that

16  you don't -- you can't open up your documents unless you're

17  advised to in terms of the attorney who's questioning you.

18          **THE WITNESS:**  I'm sorry.

19          **THE COURT:**  So, no, that's okay.  So the documents

20  that are before you either Ms. Mills or Mr. Gentry may direct

21  you to some of the documents before you, but unless they do

22  that, you can't open up the binder.

23          **THE WITNESS:**  Fair enough.  I will close them up,

24  Your Honor.

25          **THE COURT:**  Thank you.

1  BY MR. GENTRY

2  Q.    And the point you made about signing two declarations was

3  well taken.  I'm referring to the first one that was submitted

4  with the initial motion in mid May.

5  A.    Yes.

6  Q.    Okay.  Attached as an exhibit to that declaration was

7  something that purports to be a construction schedule.  Are you

8  familiar with that document?

9  A.    Yes.

10  Q.    Okay.  Who is it, if you know, that drafted that

11  construction schedule?

12  A.    If I could ask you to refer me to the exact date of that

13  construction schedule, I can tell you exactly.

14  Q.    Yes, of course.  The one that is attached to -- the one

15  that is attached as exhibit A to your declaration dated

16  4/23/2025.

17  A.    That's the construction manager who I work with who

18  provides the construction schedule.

19  Q.    Okay.  And what is his or her name?

20  A.    His name is Spencer Wright.

21  Q.    Okay.

22  A.    He's with GraniteRock-Myers Construction.

23  Q.    Okay.  So Mr. Wright is an employee of GraniteRock-Myers?

24  A.    Yes.

25  Q.    Okay.  Several versions of this particular construction

1  schedule have existed over time, is that fair to say?

2  **A.**    Yes.

3  **Q.**    Okay.  A version -- do you know which version this is, the

4  one dated April 23rd, 2025?

5  **A.**    Yes, I do.

6  **Q.**    Okay.  Which version is that?

7  **A.**    I'm sorry, I don't understand.  It's the version that's

8  from April 23rd, 2025.

9  **Q.**    So I was asking sequentially as far as which version is

10  it, is it version 4, is it version 5, version 6, version 7?

11  **A.**    I'd have to refer to the document.

12  **Q.**    The document itself does not reference a particular

13  version, but earlier versions of the document have reflected a

14  version number.  So by way of example, if I can -- well, the --

15  there was a version of this document that was submitted to the

16  Coastal Commission in March of 2025; is that correct?

17  **A.**    That is correct.

18  **Q.**    Okay.  What is your understanding of the differences

19  between this version, the one dated April 23rd of 2025 and the

20  version that was submitted to the Coastal Commission in March?

21  **A.**    Is there a specific question that I can answer in your ...

22  **Q.**    The question is what is your understanding of the

23  differences between the two schedules, if there are any.

24  **A.**    Well, the one that was submitted to the Coastal Commission

25  in March reflected the project schedule at that time and then

1   the one in April reflected the project schedule at that

2   particular time, as well.

3        You have to understand that the project itself has gone

4   through several iterations and evolution in terms of how we can

5   deliver the project in a manner that is timely and meets our

6   deadlines for the federal transit administration, which, over

7   the last six months or so has been on March 31st, 2028, because

8   that's our required deadline to deliver the project to the

9   public, who will be using the SURF! causeway to get to work and

10  to school and to healthcare and what-have-you.

11       So we have worked with the federal transit administration

12  for quite some time to make sure that we can deliver this

13  project for the public benefit by a certain date and that's

14  what is reflected in different iterations of the project

15  schedule.

16  **Q.**   Okay.  Was the project schedule dated April 23rd, 2025,

17  was that submitted to the Coastal Commission?

18  **A.**   I don't believe so.

19  **Q.**   Oh, and why not?

20  **A.**   Well, we're still going -- we were still at the time going

21  through the process of meeting all the prior-to-construction

22  conditions with the California Coastal Commission.

23  **Q.**   Okay.

24  **A.**   And when we spoke with the commission, we explicitly told

25  them that the March version was the initial submittal and that

**RHEINHEIMER - DIRECT / GENTRY**

 1  we would not have a final version of the project schedule until

 2  we had all final priority construction conditions met.  And

 3  that would be the last submittal to the California Coastal

 4  Commission so that we wouldn't have to keep resubmitting and

 5  resubmitting as conditions with a project changed over time,

 6  because at the end of the day what we need to do is make sure

 7  that as we're moving forward, we're reflecting the latest

 8  information in that project schedule.

 9       Remember, it's kind of like a budget.  You plan for what

10  you are going to be spending money on, but at the end of the

11  day, only your audit will tell you what you actually spent your

12  money on.  So a project construction schedule is just that,

13  this is what we're planning on doing and then as the project

14  gets delivered, things will change and adjust according to new

15  information.

16  **Q.**   Okay.

17       **THE COURT:**  Counsel, let me ask a couple of questions

18  just so I get a sense.

19       **MR. GENTRY:**  Of course.

20                      Examination

21  **BY THE COURT**

22  **Q.**   So Ms. Rheinheimer, when was the first version of the

23  construction schedule which then became the exhibit to the

24  declaration, about that time period?

25  **A.**   We've had a construction schedule for many years based on

RHEINHEIMER - DIRECT / GENTRY

1  the different phases of the project that we've been delivering.

2  So early on when we started the project, we would have had a

3  preliminary schedule at 35 percent design.  Then at 65 percent

4  design, which is another milestone in delivering a project, we

5  would have another project construction schedule.  And then

6  when we pulled in the CMGC contractor, that's GraniteRock-Myers

7  construction manager/general contractor, they would have had an

8  additional project schedule.

9       So we've had various iterations.

10 Q.   So is the GraniteRock one now the -- basically the

11 operative schedule or has there been another?

12 A.   This one is the operative schedule.  The --

13 Q.   Okay.  So when was the first version of this one?

14 A.   I don't --

15 Q.   So you chose GraniteRock.

16 A.   I don't recall off the top of my head, but it would have

17 been easily in 2023, early 2024.

18 Q.   Okay.  And then, so between that time period through the

19 one submitted as part of the declaration, the one which was

20 submitted to the commission, how many versions would you

21 estimate there were?

22 A.   I'm sorry, the California Coastal Commission?

23 Q.   Between the one which was submitted, the 2023, the initial

24 one, through the one which was attached to the declaration, how

25 many versions do you think there were?  I'm just trying to get

RHEINHEIMER - DIRECT / GENTRY

1   a sense, because I think --

2   **A.**   Oh, gosh.

3   **Q.**   Rough.  Like less than five?

4   **A.**   I would say probably between five and 10.

5               **THE COURT:**  Okay.  Thank you.

6        Counsel.

7               **MR. GENTRY:**  Thank you, Your Honor.

8   **BY MR. GENTRY**

9   **Q.**   So in the version that's dated April 23rd of 2025 the

10  construction start date moved up, right?

11  **A.**   Yes.

12  **Q.**   Okay.  And why is that?

13  **A.**   Well, we had all the permissions and preconstruction

14  conditions met within the city of Marina.  Remember that we

15  have three different CBPs, coastal development permits:  One

16  within the city of Marina, one which lies within the original

17  jurisdiction of the California Coastal Commission, and also one

18  with the City of Sand City.  So we're dealing with three

19  different entities and the permissions that we're required to

20  meet were all met within the city of Marina.

21       And so in order for MST to deliver the project on time and

22  within budget, we needed to be able to advance work in areas

23  where the conditions were cleared.  They were all cleared

24  within the city of Marina.  We were still waiting for the

25  conditions to be released from the City of Sand City.  And as

1    we are, you know, we are stewards of public funds, we have to

2    deliver a project in the most efficient and effective manner

3    that we possibly can.

4         And so when we looked at the -- all the conditions, we

5    knew that we could start within the city of Marina and that we

6    would make efficiencies by doing so.  And when I say

7    efficiencies, I mean we would be able to complete several

8    months-worth of work within the city of Marina and be able to

9    advance the project while we were working out the final

10   conditions through the California Coastal Commission and while

11   we were waiting for the City of Sand City.

12   Q.   Is there any other version of the construction schedule

13   which has a construction start date as early as the one dated

14   April 23rd of 2025?

15   A.   There were versions of it that are not in the record of

16   the ones that Your Honor asked about.  There were iterations of

17   the schedule that had us starting as early as, you know, late

18   2024, mid-2024, late 2024.  So, yes, there have been iterations

19   which are frankly not in the record because they're prior to

20   this particular time.

21   Q.   The version from March of 2025 has a construction start

22   date of September 2025, doesn't it?

23   A.   It does have a start of heavy construction in early

24   September of 2025.  It does have preliminary work starting as

25   early as May.

1    Q.    Okay.  Preliminary work?

2    A.    Yes, preliminary work, meaning seed collection, meaning

3    putting up fencing, meaning verifying and checking utilities.

4    Potholing, getting the site prepped and ready for work.

5    Q.    Thank you for that.

6          You and MST in general were aware that this Court entered

7    a preliminary injunction enjoining eviction of the plaintiff

8    from the premises in mid-April of 2025, right?

9    A.    We were aware.

10   Q.    Okay.  So if you're trying to further efficiencies, like

11   you indicated in your prior answer, how is that goal advanced

12   by trying to start construction in an area where my client was

13   currently operating and federal court injunction prohibits them

14   from being removed?

15   A.    Well, remember, all the priority construction conditions

16   had been met at that time with the city of Marina.  There's

17   also work that is in -- outside of the area where the handcars

18   are currently operating that was available to us.  Remember,

19   what we're trying to do is advance a project that has a very

20   specific deadline through the federal transit administration,

21   making sure that we're delivering a project to the benefit of

22   the public as soon as we can.

23   Q.    So is it your testimony that MST was actually ready to

24   begin construction in the city of Marina on or around May 23rd,

25   2025, as indicated in that construction schedule?

RHEINHEIMER - DIRECT / GENTRY

1   **A.**   Yes, we started construction preliminary work in April of

2   2025 in the city of Marina.

3   **Q.**   You started preliminary work?

4   **A.**   Yes, we did.

5   **Q.**   But not actual construction?

6   **A.**   We started tree removal.  I'll be specific.

7   **Q.**   Okay.

8   **A.**   We started tree removal in April of 2025.

9   **Q.**   Okay.  And did -- was there maybe one or two trees that

10  were difficult to remove because of my client's presence?

11  **A.**   There were.

12  **Q.**   Okay.  And why was that?

13  **A.**   It was behind a gate, a locked gate, that the handcar

14  business controls.

15  **Q.**   Okay.  Did you inquire with them, either of the Clarks, as

16  to whether MST's contractors could access that locked gate?

17  **A.**   Our relationship on this project is with the

18  transportation agency for Monterey County, who's the owner of

19  the Monterey branch line, and we were in communication with the

20  transportation agency in terms of the project schedule.

21  **Q.**   Okay.  Do you know whether anybody from the transportation

22  agency --

23  **A.**   I do not know that.

24  **Q.**   So the question was do you know whether anyone from the

25  transportation agency of Monterey County inquired of the Clarks

1  as to whether that locked gate could be opened?  And I think

2  the answer was?

3  **A.**   I do not know the answer to that.

4  **Q.**   Okay.

5             **THE COURT:**  Follow-up question, counsel.

6  **BY MR. GENTRY**

7  **Q.**   Ms. Rheinheimer, did you or anyone else at MST ask TAMC to

8  reach out to the Clarks?

9  **A.**   We did not.

10 **Q.**   Did TAMC ever suggest that that might be possible or

11 suggest it may not be possible?

12 **A.**   I don't recall.

13            **THE COURT:**  You can continue.

14            **MR. GENTRY:**  Thank you, Your Honor.

15 **BY MR. GENTRY**

16 **Q.**   So just to kind of dive a little further into the issue of

17 starting construction in the city of Marina in the latter part

18 of May of 2025, this year, did MST have an executed

19 construction contract at any time prior to May 30th of 2025?

20 **A.**   MST had an executed contract for tree removal services at

21 that time.

22 **Q.**   But did -- the question was a little more specific than

23 that.  Did it have an executed construction contract with its

24 general contractor, GraniteRock-Myers?

25 **A.**   No, that came -- we had the board authority as of April 14

1    of 2025 to execute a contract with the construction company,

2    and we were finalizing the negotiated details at that time, and

3    they executed construction contract as of early June.

4    **Q.**   Right.  I believe it was attached as exhibit J to your

5    second declaration.

6    **A.**   I'll take your word for it.

7    **Q.**   Does that sound right?

8         Okay.  So I'm curious how the April 23rd, 2025, schedule

9    was supposed to work if it sets a construction start time or

10   start date of May 23rd, 2025, but you still don't have an

11   executed contract with your general contractor until about

12   seven days later or more.

13   **A.**   Right.  So when we put together the schedule for April,

14   that was as of early April, and we did anticipate executing a

15   construction schedule by the time that we indicated on that

16   schedule.  We did not know at the time that it would take, you

17   know, several weeks longer to execute that contract.  It's

18   entirely, you know -- on almost any single project we'll have,

19   you know, adjustments in the schedule.  What your schedule is

20   is your best guess as to when that particular item may and

21   should happen, but again, it's not -- it's not a certain that

22   every single thing will happen on that schedule; however, it

23   was our best guesstimate at that time.

24   **Q.**   Okay.  I'm just looking here, and I can show you on the

25   little screen here, the April 23rd, 2025, schedule does show

1 construction notice to proceed as occurring on May 16th of

2 2025.  Now, what is your understanding of what that means?

3 **A.**   The notice to proceed?

4 **Q.**   Correct.

5 **A.**   The notice to proceed is a document that is provided to

6 the contractor after the contract is signed that says here are,

7 you know -- you have the right to start the contract.  You have

8 the right to start the work and begin work accordingly.

9 **Q.**   Okay.  Has any notice to proceed been provided to the

10 general contractor, GraniteRock-Myers?

11 **A.**   Yes.

12 **Q.**   Do you know when that was provided?

13 **A.**   It was provided shortly after the construction contract

14 was signed.

15 **Q.**   Do you know whether that's part of the record before the

16 Court?

17 **A.**   I do -- did not see it as part of the record.

18 **Q.**   Okay.  And do you know why that is?

19 **A.**   I do not know.

20 **Q.**   Okay.  Now, one other thing we can dive into.  The

21 construction contract that was attached as exhibit J to your

22 second declaration did not have any exhibits attached to it.

23         **THE COURT:**  I'm sorry, counsel.  What was the --

24 repeat that question.

25         **MR. GENTRY:**  It was more of a statement.

RHEINHEIMER - DIRECT / GENTRY

1            **THE COURT:**  Sure.  That's fine.

2 **BY MR. GENTRY**

3 **Q.**  The copy of the construction contract with the general

4 contractor that was attached as exhibit J to your second

5 declaration, the one that was filed in support of the reply to

6 our opposition, does not have any exhibits attached to it.  I'm

7 curious if you have an understanding as to why that is.

8 **A.**  I do not.

9 **Q.**  Okay.  Do you know whether the exhibits to the

10 construction contract exist?

11 **A.**  Yes, they do.

12 **Q.**  Okay.  All of them?

13 **A.**  Yes.

14 **Q.**  Okay.  Including the preconstruction agreement schedule

15 for construction, which is listed as exhibit 5?

16 **A.**  It does exist.

17 **Q.**  Okay.  And what does it say about the construction

18 schedule?

19 **A.**  I would have to go back and take a look at it.

20 **Q.**  But in any event, it's not before the Court?

21 **A.**  If you're asking if that exhibit is included in the court

22 documents, I would say "no".

23 **Q.**  Understood.

24            **THE COURT:**  Mr. Gentry, I'm just going to interrupt

25 for a moment just to ask a couple of follow-up questions.

1                          Examination

2   **BY THE COURT**

3   **Q.**   So Ms. Rheinheimer, just to clarify, there's mention of

4   one or two trees, two or three.  Are there any trees remaining

5   at this point?

6   **A.**   Yes.

7   **Q.**   In terms of ... so how many trees has MST been unable to

8   remove due to the museum's operation?

9   **A.**   At least one.

10  **Q.**   Okay.

11  **A.**   There is another that is slated to be removal which is

12  also past that locked gate, and there are other trees within

13  the general area where the handcars currently have their

14  ticketing booth area, but that's not of issue for MST.

15  **Q.**   So it's one which is at issue?

16  **A.**   One was at issue in May and there was another one that we

17  were waiting for the birds to fledge, and then we would need to

18  get that one, as well.  So there are two behind that locked

19  gate that we would need access to.

20  **Q.**   Okay.  And then going back to the earlier questions

21  regarding the prior -- regarding Sand City versus Marina versus

22  the original jurisdiction with the CCC, those three --

23  **A.**   Yes.

24  **Q.**   -- areas, I understand from you that the Marina was the

25  first one which was ready to go, so to speak?

RHEINHEIMER - DIRECT / GENTRY

1   **A.**   Yes.

2   **Q.**   I'm going to do this in nontechnical speak.

3   **A.**   Absolutely.

4   **Q.**   In terms of the other two, you said MST was still waiting?

5   **A.**   Yes.

6   **Q.**   Okay.  For permits or whatever else was needed?

7   **A.**   Just permits.

8   **Q.**   Was there any -- was MST doing any prioritization between

9   those three locations?

10  **A.**   When I say permits, I'm sorry, let me just back up real

11  quick because I think it's important.

12      We have all the permits necessary for the project.  The

13  issue is that we had to meet certain prior-to-construction

14  conditions.

15  **Q.**   Yes.

16  **A.**   And so we were working on those prior-to-construction

17  conditions with the City of Sand City, Coastal and Marina was

18  all set.

19  **Q.**   Could any of those have been prioritized or expedited

20  during that time period of April, May, March -- I mean

21  April-May?  Sorry.

22  **A.**   Had it not been for the handcar, we would have been in

23  there today doing construction work in the area where they have

24  their ticketing booth.  Sand City at the time had not cleared

25  all of our prior-to-construction conditions yet, and we were

RHEINHEIMER - DIRECT / GENTRY

1    still working with the California Coastal Commission on working

2    through each of the issues in the prior-to-construction

3    conditions.

4        So the only places that were available were the areas

5    within city of Marina, but for the handcar still operating.

6    **Q.**    So now are the other prior-to-construction conditions

7    completed in either of those two other locations?

8    **A.**    Yes.  So Sand City has completed their review and have

9    provided us authority to move forward with the construction

10   within Sand City.  We're finalizing the last little pieces.

11   We've met all of the conditions with the California Coastal

12   Commission.  What we have to do now is provide all of the

13   plans, the package and everything that meets all of those

14   conditions in a finalized format so that the Coastal Commission

15   can put their stamp of approval on it as ready for construction

16   --

17   **Q.**    Okay.

18   **A.**    -- approved for construction.

19   **Q.**    And so during the pendency of the injunction or when the

20   injunction has been in place, are there other actions that MST

21   could or did take in terms of moving forward those two other

22   locations?

23   **A.**    We -- I think it might be helpful, Your Honor, if I

24   explain the process by which we've been working with the

25   California Coastal Commission and the City of Sand City in

 1  meeting all of the prior-to-construction conditions.  And

 2  please interject if I'm going too far afield of where you're

 3  trying to go.

 4  **Q.**  You can briefly summarize, but I also just want to make

 5  sure that --

 6  **A.**  I will try to be brief.

 7      So the California Coastal Commission, we've been meeting

 8  with them on a weekly basis going through the issues, and we

 9  are at the point where we have agreed on all of the sort of

10  technical aspects of the project.

11      We also did the same thing with Sand City.  We met with

12  them fairly frequently.  I wouldn't say as often as weekly, but

13  I'd say every other week.

14  **Q.**  Uh-huh.

15  **A.**  At least once a month to go through each of the issues

16  that we were trying to resolve.

17  **Q.**  When did MST obtain Sand City's authority to move forward

18  with construction within its jurisdiction?

19  **A.**  That would have been June -- if it's a Monday, June 9th.

20          **THE COURT:**  Okay.  Thank you.

21          **THE WITNESS:**  Thank you.

22          **MR. GENTRY:**  Continue?

23          **THE COURT:**  You may continue.

24  **BY MR. GENTRY:**

25  **Q.**  So is GraniteRock-Myers the construction manager or is it

1   the prime contractor?

2   **A.**   It is both.

3   **Q.**   Both?  Okay.

4   **A.**   It's a CMGC project.  It's an alternative project delivery

5   method.

6   **Q.**   Okay.  And was that sent out for competitive bid?

7   **A.**   That's not the way that that particularly works in terms

8   of the contract for construction.  We did competitively bid the

9   CMGC preconstruction, preconstruction services.

10  **Q.**   Okay.  So you indicated that a notice to proceed had been

11  issued to GraniteRock-Myers to start --

12  **A.**   Yes.

13  **Q.**   -- general construction?

14  **A.**   Yes.

15  **Q.**   Okay.  Has GraniteRock-Myers obtained insurance and bonds

16  that would be needed for the contract?

17  **A.**   Part of the initial part of a construction project is to

18  go through all of the submittals and the work that needs to be

19  done to mobilize them for construction.  So over the next month

20  or two they'll be providing the bonds and submitting the

21  quality control, quality assurance program and all of the

22  requirements in those submittals.  So as of today, no, they

23  have not, but that's part of the process as we move forward and

24  the project moves towards construction.

25  **Q.**   So can they actually go out and break ground without the

1    insurance bonds, those other things?

2    **A.**   They are required to provide those to MST before, you

3    know, a shovel gets into the ground and starts construction in

4    earnest, yes.

5    **Q.**   Okay.  Thank you for that.

6         So we talked a little bit about permits and the City of

7    Marina and you indicated that MST or TAMC has all of the

8    necessary permits to start construction in the city of Marina?

9    **A.**   That is correct.

10   **Q.**   Okay.  Were copies of those permits attached as exhibits

11   to your declaration or declarations?

12   **A.**   Yes.  Would you like me to point to which one it is?

13   **Q.**   So I think there was a reference in the second declaration

14   to a -- find the exact ... it was something to the effect of an

15   agreement with the City of Marina that was attached as exhibit

16   I, I believe.  Is that the permit?

17   **A.**   Are you referring to the Marina public improvement

18   agreement?

19   **Q.**   That is correct.

20   **A.**   Yes, that is the -- what the City of Marina told us was

21   that was the permission to proceed in the city of Marina, which

22   they executed on November 15th of 2024.

23   **Q.**   Okay.  Thank you for that.

24        One other issue in terms of permitting is the U.S. Fish

25   and Wildlife Service; is that correct?

RHEINHEIMER - DIRECT / GENTRY

1    **A.**    Yes.

2    **Q.**    Okay.  U.S. Fish and Wildlife Service had conducted a

3    biological, let's say survey in 2022, right?

4    **A.**    That's not exactly correct.

5        The U.S. Fish and Wildlife Service relies on the

6    information that MST provided through its biologists and

7    through our consultants who do the biological survey.  They're

8    U.S. Fish and Wildlife-certified biologists to, you know,

9    collect information, and they surveyed the area in 2022.

10        MST is -- it is a federally funded project through the

11    federal transit administration, and as such, the federal

12    transit administration is the lead agency essentially for the

13    federal action.  The federal action requires that if there is a

14    threatened or endangered species within the project area, they

15    would -- especially plants or animals, they would consult with

16    the U.S. Fish and Wildlife Service.

17        Federal take permit would be required if there is a

18    threatened or endangered species which would be impacted by a

19    construction project or a project where heavy equipment or

20    vehicles or some such would harm the threatened or endangered

21    species.

22    **Q.**    So thank you for that clarification.

23        U.S. Fish and Wildlife Service issued I guess what they

24    called a biological opinion?

25    **A.**    They did.

1   Q.   In 2022?

2   A.   Yes, they did.

3   Q.   Okay.  And as you indicated, it sounds like that was based

4   perhaps in large part on information that MST provided to it

5   based on work that its biologists had conducted?

6   A.   Yes.

7   Q.   Correct?

8        Okay.  Between 2022 and the present date did the surplus

9   project change materially?

10  A.   Actually, when the California Coastal Commission approved

11  the project and provided MST with a coastal development permit,

12  what it did was require that the project largely stay on top of

13  the former rail line.  In other words, all of the ballasts, the

14  ties, the railroad tracks would all be removed or re-purposed,

15  and the busway would be on top of the railroad tracks.

16       And so in 2022 that was not the case, and when the -- when

17  the coastal development permit came in for us, that resultant

18  acreage that was impacted and the area that was impacted

19  actually reduced from .14 acres to .13 acres of impacted area

20  with regard to the threatened and endangered species that were

21  within the corridor.

22  Q.   You said .13 acres, but what's the basis for that?

23  A.   I have -- the biologists resurveyed the area and provided

24  a memo to MST showing the difference between the October

25  biological opinion area and the new area as a result of the

1   coastal development permit.

2   **Q.**   But the change in the project necessarily means that the

3   impact on the environment would probably be different, right?

4   It's a different project if the ballast is coming out, the

5   track is coming out, probably being hauled away and then maybe

6   hauled back after some process, that's a different project than

7   the one that existed or the one that was proposed in 2022,

8   isn't it?

9   **A.**   That is correct.

10  **Q.**   Okay.

11  **A.**   That's why we initiated with the U.S. Fish and Wildlife

12  Service through the FTA a re-consultation with them because we

13  did recognize that the area had changed and we wanted to make

14  sure the U.S. Fish and Wildlife Service was aware of the fact,

15  and we provided them a memo through our consultant to show the

16  differences.

17  **Q.**   And has the U.S. Fish and Wildlife Service updated or

18  reissued its biological opinion based on the new information

19  you provided or that MST provided?

20  **A.**   Right.   So we've been working with the U.S. Fish and

21  Wildlife Service, have had several meetings with them regarding

22  this change, and they will honor the iterations that we've been

23  going through.   That's not exactly how they do it.   They don't

24  necessarily reissue the biological opinion.   They will reissue

25  the conditions, but not the actual biological opinion itself.

1    Q.   But they will update it to reflect the differences in the

2    project --

3    A.   Yes.

4    Q.   -- in the way it's constituted now versus the way it was

5    then?

6    A.   Yes.

7    Q.   And it sounds like they have not yet issued that or

8    provided that updated --

9    A.   Right.

10   Q.   -- biological opinion?

11   A.   Their schedule has -- they've shared with us their

12   schedule that that will be finalized in early to mid July.

13   Q.   Okay.  And isn't it true that the U.S. Fish and Wildlife

14   biological opinion also includes biological impacts in the city

15   of Marina?

16   A.   It has very few.  There are three Monterey spineflower

17   which are within the city of Marina's area in the Palm and Del

18   Monte to the freeway overpass.  So there are very few U.S. Fish

19   and Wildlife Service issues within the city of Marina; the

20   impacts are very low.

21   Q.   Okay.  The impacts are low, but they are not none.

22   Greater than zero?

23   A.   Right.  So I would further say that we've already

24   collected the seeds from the Monterey spineflower which are

25   within the city of Marina, and they would not be an impediment

**RHEINHEIMER - DIRECT / GENTRY**

1  for us to move forward within the city of Marina with regard to

2  U.S. Fish and Wildlife Service conditions.  Those conditions

3  have already been met within the city of Marina.

4  **Q.**   But doesn't the U.S. Fish and Wildlife Service need to

5  provide the updated biological opinion in order to give MST the

6  green light, let's say, to start construction?

7  **A.**   No, that's not what they shared with us.  They've shared

8  with us we can still continue doing our work and we've been in

9  consultation with them, and seed collection of the Monterey

10  spineflower, we've been in consultation with them about

11  collecting those seeds because we don't want to miss that

12  window.

13      If we miss the Monterey spineflower window, which starts

14  in May, for a whole 'nother year waiting for the biological

15  opinion, you know, conditions to be, you know, re-released, we

16  would miss a complete year of work, which would -- which would

17  be catastrophic for the project delivery.

18          **THE COURT:**  So just to confirm.  Pardon me.  One more

19  interruption.

20      So just to confirm, the spineflower seeds have now been

21  collected?

22          **THE WITNESS:**  Within the city of Marina, yes.  They

23  are continuing to collect Monterey spineflower on the rest of

24  the corridor, and if they're not complete last week, they'll be

25  complete this week.

RHEINHEIMER - DIRECT / GENTRY

1      **THE COURT:**  Okay.  Thank you.

2      **THE WITNESS:**  Uh-huh.

3  **BY MR. GENTRY**

4  **Q.**   So is it your testimony that MST does not need a further

5  updated biological opinion from U.S. Fish and Wildlife Service

6  to actually start construction, like shovel in the ground

7  construction?

8  **A.**   The -- can you rephrase that, please?

9  **Q.**   So is it your testimony that MST does not need a further

10  updated biological opinion from the U.S. Fish and Wildlife

11  Service to break ground in the city of Marina?

12  **A.**   I think it's a little bit more nuanced than that.  What we

13  need from the U.S. Fish and Wildlife Service is not necessarily

14  a full updated biological opinion.  What we need from them is

15  the agreed-to mitigation measures which were contained in the

16  biological opinion.  It's a portion of it, not the entirety of

17  it.

18  **Q.**   Okay.  But it's still something new or updated that is

19  needed from U.S. Fish and Wildlife Service in order to

20  greenlight breaking ground in the city of Marina?

21  **A.**   I think there may be some more gray area that is not -- is

22  not being characterized.

23  **Q.**   Can you explain what you mean by that?

24  **A.**   I will do my best.

25      So when we've had conversations with the U.S. Fish and

RHEINHEIMER - DIRECT / GENTRY

```
 1   Wildlife Service, they never said, okay, you can't do any work.
 2   They said, okay, I see that, you know, the conditions have
 3   changed, and we need to update, you know, some of the
 4   information.  As we're moving along in this process, you need
 5   to comply with the latest iteration of the -- of the mitigation
 6   measures, right?
 7        So if they didn't, you know, issue the change mitigation
 8   measures until, say, August, that wouldn't be problematic for
 9   us because we'd still be working on the required seed
10   collection for the buckwheat, for example, in August, and maybe
11   even into September.  We've already agreed to the mitigation
12   measures.  It's a matter of them putting the stamp on it.
13   Q.   Okay.
14        THE COURT:  Mr. Gentry, I'm going to have you go at
15   the most for another few minutes.
16        MR. GENTRY:  Okay.
17        THE COURT:  Then I'll save a couple minutes for
18   rebuttal.
19        MR. GENTRY:  Sounds good.
20   BY MR. GENTRY
21   Q.   So just to touch briefly on the issue of seed collection,
22   it sounds like the biologists have been able to collect seeds;
23   is that correct?
24   A.   They have.  They've been limited to Tuesdays and
25   Wednesdays.
```

1  Q.   Okay.  And are you aware of any material delays to the

2  seed collection process that have been caused because of that?

3  A.   When I told our biologists, our lead biologists at

4  Harrison Associates that they only have Tuesdays and Wednesdays

5  when the handcars are not operating, she said that is very

6  limiting.

7       So keep in mind that our consultants are -- the sub

8  consultants who are doing some of this work are not just

9  working on MST's project, they're working on other projects

10 throughout the state.  And, you know, narrowing a window to two

11 days is very limiting.

12 Q.   Okay.  So I want to get into the issue of the budget.

13 A.   Okay.

14 Q.   Since that's an item of concern.

15      My understanding, and please correct me if I'm wrong, the

16 only budget that has been brought to the Court's attention is

17 the budget that was submitted to the federal transit

18 administration I think around the end of last year?

19 A.   Okay.

20 Q.   You indicated in your declaration that MST has a budget

21 and that the MST budget includes a budget for retaining walls.

22 Do you have an understanding as to why the MST budget wasn't

23 submitted along with your declaration?

24 A.   I don't recall.

25 Q.   Okay.  Do you have a -- what's your understanding as to

1  the differences, if any, between the Federal Transit

2  Administration budget and the MST budget?

3  **A.**   If you're referring to the retaining walls and the

4  differences in one version of the budget that went to the

5  Federal Transit Administration and another, there was a line

6  item, and I'd have to refer back to it to show you the specific

7  line item that shows retaining walls, and then in a later

8  version that money from the retaining walls was no longer on

9  the line.

10      And the reason why that retaining wall budget with the FTA

11  was moved, was changed, was because the Federal Transit

12  Administration's project management oversight consultant told

13  us to move that item into the main component of the busway.  So

14  it wasn't like it was just deleted and we don't have a budget

15  for retaining walls, it was just reassigned to another line

16  item.

17  **Q.**   So is it your testimony that the $105 million budget that

18  was provided to the Federal Transit Administration also

19  includes all of the retaining wall cost and expense that is

20  likely to be incurred by the MST?

21  **A.**   Yes.

22  **Q.**   Okay.  I want to touch briefly on the issue of the flange

23  lubricators.

24  **A.**   Okay.

25  **Q.**   To your knowledge, has any environmental testing been done

1    as to the extent, if any, of contamination resulting from the

2    flange lubricators?

3    **A.**    Yes.

4    **Q.**    Okay.  And what testing is that?

5    **A.**    The lab that GraniteRock-Myers has did some testing on the

6    flange lubricators.  One of the flange lubricators did not have

7    any problems with any kind of contamination.  The other one

8    did.  It was a petroleum product.  And we've been in contact

9    with the Monterey County environmental health department on how

10   to properly dispose of those flange lubricators and properly

11   dispose of the area surrounding the one that has contamination.

12   **Q.**    So is it your testimony that testing has been done in the

13   soil --

14   **A.**    Yes.

15   **Q.**    -- surrounding that flange lubricator?

16   **A.**    Yes.

17   **Q.**    Okay.  And it's been ascertained how much pollution leaked

18   into the soil; is that correct?

19   **A.**    There is an initial assessment, yes.  As the -- when the

20   flange lubricator -- let me back up.

21        MST had a project where we removed a building a number of

22   years ago and it relates to this because I do have some

23   experience in removing material that needs to be removed and

24   sent to a proper location.  We had a building that needed to be

25   removed.  It lead-based paint, it had asbestos.  We moved that

RHEINHEIMER - DIRECT / GENTRY

 1   all out and around the perimeter of the building we tested for

 2   lead.  Six feet out, six inches down, and it came back with

 3   results that that material could not be used for commercial or

 4   reused.  So it had to be taken away to a proper facility.

 5        We had to go down another six inches and test that

 6   material for lead.  It came back as inappropriate for reuse, so

 7   it had to also be hauled away.  And again we went down another

 8   six inches.  So 18 inches, six feet out, and we pulled all the

 9   material out, sent it to a facility that accepted that type of

10   material.

11        This would be the same process, except that petroleum

12   isn't -- isn't regulated the same way lead is regulated, so

13   we're working with the Department of Environmental Health at

14   the county to get the permit and make sure that we're taking

15   out a material in the dune environment that should not be

16   there.

17   Q.   Do you have an understanding based on the testing that has

18   been -- that's already been done as to how deep the

19   contamination goes?

20   A.   That would be part of removing the flange lubricator and

21   as we're removing material, we'll continue to test until

22   there's no more -- there's no more material that would be

23   problematic.

24   Q.   Understood.  But if the flange lubricator has not yet been

25   removed, then the extent of the contamination must also

**RHEINHEIMER - DIRECT / GENTRY**

1  necessarily be unknown, right?

2  **A.**   It would be unknown as to maybe the depth or ... because

3  when the -- when they did the testing, when GraniteRock-Myers

4  did the testing, they tested a number of feet out from the

5  flange lubricators to ascertain where the limits were.  So it

6  would be more a matter of depth, not width.

7  **Q.**   Okay.  But still, if it was very deep, that would increase

8  the cost, would it not?

9  **A.**   It -- it may.  It's unlikely.

10  **Q.**   Okay.  Couple more questions here.

11      You indicated in your declaration, the second one, the one

12  that was filed in support of the reply -- and I'm going to

13  quote the exact language here.  It's from paragraph 10.  Quote,

14  there were significant construction cost savings by moving the

15  busway to on top of the railroad tracks, as required by the

16  Coastal Commission, end quote.

17      What did you mean by that?

18  **A.**   When the Coastal Commission moved the busway to on top of

19  the railroad tracks, about 50 percent of the retaining walls

20  were no longer needed.  So grading for retaining walls, the

21  cost of putting in retaining walls, that was significantly

22  reduced.

23  **Q.**   And then, why is that, that the retaining walls were not

24  needed?

25  **A.**   The -- because of the topography of where we were.  So by

1  moving it 10 feet or 15 feet over, that slope, whether it was

2  this way or this way (indicating) was no longer needed to be

3  retained by a retaining wall.

4  **Q.**   Okay.  Is it fair to say that the redesign triggered by

5  the coastal commission's permit approval also resulted in other

6  costs being likely be incurred in connection with the project,

7  such as removing the rail, removing the ballast, trucking all

8  of the ballast material away from the area?

9  **A.**   It would, of course, have a cost, but it didn't have the

10 same magnitude of cost as retaining wall work.  Retaining wall

11 work is specifically intensive and, you know, reusing the

12 ballast is a material asset to the project in and of itself.

13 That means we don't have to truck in a whole bunch of other

14 material.  We can reuse it as a base material on the busway.

15 **Q.**   Understood.  But it also has to be trucked away and

16 processed, crushed perhaps, and then brought back.

17 **A.**   It will be trucked away to a site which is adjacent to the

18 Fifth Street station area, and equipment will be brought in to

19 crush it and put it back onto the busway.

20 **Q.**   Understood.

21    Is the cost of removing the ballast material, crushing it

22 and bringing it back, is that accounted for in the FTA budget?

23 **A.**   I would have to double-check with the team on that very

24 specific question.

25 **Q.**   Do you know how much that cost -- that cost is, the

1    estimated amount?

2    **A.**   I do not.

3    **Q.**   Okay.

4    **A.**   It's contained within the construction contract.

5    **Q.**   Okay.

6    **A.**   That's part of the cost of the construction contract.

7    **Q.**   So that was another thing I wanted to ask.  You -- and

8    this is part of the problem that we experienced just from the

9    lack of exhibits for the construction contract.  You had

10   referenced a number, a very specific number, down to the cent,

11   as to the cost of retaining wall construction that you had

12   indicated was in the construction contract, but I wasn't able

13   to locate where in the construction contract it was.  And so

14   the number for your reference in paragraph 10 of your

15   declaration in support of the reply is $4,646,061.76.  So is

16   that --

17   **A.**   I asked our construction estimator how much the retaining

18   wall cost was, and that was a number that she provided to me.

19   **Q.**   Okay.  And your declaration indicates that that -- that

20   that is included in the construction contract.  Is it part of

21   one of the exhibits or is it just a number that you were

22   provided by a representative of the general contractor?

23   **A.**   It's included in one of the exhibits.

24   **Q.**   Okay.  Which, again, were not included with your

25   declaration, unfortunately.

1          **THE COURT:**  Mr. Gentry, if you want, if you need time

2     to ask a couple follow-up questions, you'll have time.

3          **MR. GENTRY:**  That sounds good.

4          **THE COURT:**  So Ms. Mills, before you begin I'm going

5     to ask a couple follow-up questions.

6          **MS. MILLS:**  Certainly.

7          **THE COURT:**  Maybe that will help shape what you want

8     to ask.

9                              Examination

10    **BY THE COURT**

11    **Q.**   You ready?

12    **A.**   I am.

13    **Q.**   Okay.  Let me ask some questions about the seed, if that's

14    all right.

15    **A.**   Sure.

16    **Q.**   So in the declaration from May of 2025 you had indicated

17    that railroad tracks and ties may need to be removed.  It

18    sounds like seed collection has to be done.  So what is the

19    status of that?  Would anything need to be removed?  Because it

20    doesn't seem like it.

21    **A.**   I don't think so at this point.

22    **Q.**   Okay.

23    **A.**   I was referring to the biological opinion in that

24    statement and I wasn't sure at the time if we needed to.  Since

25    then, our biologists have been able to go out and collect

**RHEINHEIMER - DIRECT / GENTRY**

1  seeds, you know, in the limited time window that we have while

2  handcars are still operating.

3  **Q.**   And when did the seed and soil collection begin?

4  **A.**   It began in late May, May 19th on or about, just for the

5  Monterey spineflower.

6  **Q.**   And is there an estimate of how many hours it will take to

7  collect seeds and soil?

8  **A.**   I don't have that off the top of my head.  It is pretty

9  intense, though, if you see the pictures of our biologists out

10  there, you know, almost with tweezers trying to pull out the

11  seeds there.

12      I don't know that the bulk wheat plants in August and

13  September will be as time intensive, but there are over 500

14  buckwheat plants that we have to get to.

15  **Q.**   And so right now it seems like there hasn't been any

16  effort to try to reach cooperation or to have any sort of

17  working in sync with the museum or at least not that you're

18  aware of, that there has been outreach to the museum about

19  coordinating the soil and seed collection?

20  **A.**   That would be a correct statement.

21  **Q.**   And then with this schedule now you're discussing of

22  Tuesday and Wednesday, is it expected that the seeds -- let's

23  say an injunction were to stay in place.  Is like right now

24  with the time estimate of Tuesday and Wednesday, is it expected

25  that the seed -- soil and seed collection would complete this

1    summer-winter, summer-fall in a timely manner?

2    **A.**    I don't know the answer to that question comprehensively.

3    I'd have to go back to our seed collection folks.

4        The best I can say is having only two days a week

5    available for seed collection according to our biologists is

6    very limiting.

7    **Q.**    Okay.

8    **A.**    So here's the challenge with seed collection, if I can

9    expand a little bit.

10        Not every plant seeds at the same time and there's two

11    different types of buckwheat plants out there that seed at

12    different times, and it's all dependent on weather, where

13    they're located, just little micro climate issues.  And so we

14    need to continually monitor them to make sure that we're

15    getting the right time for that seed, to make sure we're

16    getting enough seeds to be able to plant in, you know, three

17    times the area in other locations.

18    **Q.**    And let me move you to tree removal.

19    **A.**    Okay.

20    **Q.**    So in your declaration it cites to being $15,000, that

21    the -- the cost associated with the tree removal will increase

22    due to delays by at least $15,000.  So what's the basis of the

23    15,000?

24    **A.**    So what we had originally tried to do was remove the trees

25    within a certain window of time after September 15th, but

RHEINHEIMER - DIRECT / GENTRY

1  before January 31st.  That's when there are no issues with

2  avian species.

3       When -- after January 31st -- this is any year.

4  **Q.**  Yeah.  So this is not --

5  **A.**  No, no.

6  **Q.**  Okay.  All right.

7  **A.**  Any year, because that's --

8  **Q.**  Right.

9  **A.**  -- the time when birds are nesting.

10  **Q.**  I understand that.  I've read that in the --

11  **A.**  Okay.  Perfect.

12  **Q.**  The birds and the patterns have been discussed in the

13  papers.

14  **A.**  Perfect.

15  **Q.**  So the 15,000, like, what is that cost?

16  **A.**  That cost is to monitor for birds and make sure that we're

17  not cutting down a tree after this -- the January 31st

18  timeframe.  So we need to have somebody out there, binoculars,

19  looking at the trees, making sure there are no dark-eyed juncos

20  or Anna's hummingbirds or California scrub jays nesting at that

21  time so we avoid those trees so that they can do their thing,

22  the birds can fledge.

23  **Q.**  I'm sorry to interrupt, but it sounds like so the cost is

24  to monitor the --

25  **A.**  Yes.

RHEINHEIMER - DIRECT / GENTRY

1  Q.    -- trees when you're trying to decide when to -- when to

2  go and then remove it?

3  A.    That is correct.

4  Q.    So aren't you going to have that cost for monitoring that

5  tree whether you do it in January 2025 or January of 2026,

6  correct?  It sounds like the operational cost of taking a look

7  at that tree and making sure there are no birds in it.

8  A.    Yes, only outside of that September to January 31st

9  timeframe.

10  Q.    And that $15,000, is that monitoring of the tree or the

11  trees, that doesn't boil down to the tree, correct?

12  A.    It boils down to all the trees.

13  Q.    That's what I thought.  I was trying to wrap my head

14  around 15,000.  So that's helpful.  Thank you.

15  A.    You're welcome.

16  Q.    And then Sand City has received all of its approvals now?

17  A.    Yes.

18  Q.    So at this point has -- and that was in the beginning,

19  earlier in June, correct?

20  A.    (Nods head.)

21  Q.    And so, has that work begun?

22  A.    That work has not begun.  It's a little bit more tricky in

23  Sand City because there are traffic impacts.

24  Q.    Uh-huh.  I know that.

25  A.    You know that area, right?

RHEINHEIMER - CROSS / MILLS

1    **Q.**    I do.

2    **A.**    Where the Costco is?

3    **Q.**    Yes?

4    **A.**    And then there's an onramp.  And so there's a lot of work

5    that needs to happen in terms of timing of those, of the work

6    in there, to make sure that we're not impacting, say, the week

7    before Thanksgiving because that's really, you know, people are

8    just there.

9    **Q.**    And they always go to Costco?

10   **A.**    And they always go to Costco.

11          So we're going to try to time it with the City of Sand

12   City so that it's the least impact to the traveling public

13   around there, and we haven't had those specific conversations

14   yet.  As we move into the, you know, the school season and then

15   the Thanksgiving and Christmas and everything like that, it's

16   going to be a little bit tricky there.

17   **Q.**    Can work in Sand City and Marina happen simultaneously?

18   **A.**    Yes.

19          **THE COURT:**  All right.  Thank you.

20          **THE WITNESS:**  Uh-huh.

21          **THE COURT:**  Ms. Mills, your witness.

22          **MS. MILLS:**  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24   BY MS. MILLS

25   **Q.**    Ms. Rheinheimer, is it fair to say at this point that MST

1   has satisfied all prior-to-construction condition?

2   **A.**    Yes.  It would be fair to say that, and at this point

3   we're at a point where we're, you know, dotting the I's,

4   crossing the T's, and we'll be resubmitting final construction-

5   ready documents to the Coastal Commission this week, and then

6   they'll, you know, do their stamp of approval when they do

7   their stamp of approval.

8   **Q.**    Right.  But in any event, that process would not affect

9   the ability of the project to move forward with construction at

10  this point; is that true?

11  **A.**    We could start construction within the area of Palm and

12  Del Monte in Marina today but for the handcar and this

13  particular situation with the injunction.

14  **Q.**    All right.  So you were just asked questions about the

15  effect of the presence of the tracks on the seed collection,

16  correct?

17  **A.**    Yes.

18  **Q.**    All right.  But there is an issue with the tracks that the

19  handcars' operation on the tracks beyond the seed collection at

20  this point in time.  Is that true?

21  **A.**    Well, yes.

22  **Q.**    Okay.  So can you explain to us what a critical path item

23  is?

24  **A.**    Sure.  A critical path item is designed to inform a

25  project team and a project schedule of what work needs to

1   happen in order for other pieces of work to then continue.

2   It's like if that particular thing doesn't happen, there's a

3   cascading effect on everything else in the schedule.

4   **Q.**   Okay.  And can you please tell us what the critical path

5   item in this particular project is?

6   **A.**   Removal of the railroad tracks.

7   **Q.**   And why is that?

8   **A.**   Well, in all, most all iterations of our design, whether

9   it was at 35 percent, 65 percent, 95 percent or a hundred

10  percent design, there has always been track removal within the

11  project.  To the extent that it was total track removal

12  happened on September 12th, 2024 when the California Coastal

13  Commission required that all track within their jurisdiction be

14  removed, but there was always going to be some track removal

15  within Palm and Del Monte, there was going to be track removal

16  within Sand City to provide cost savings to the project.

17       So generally along the rail corridor there's a

18  hundred-foot right-of-way, but there are places where it's

19  narrower, there are places where it's wider.  And so in the

20  places where it's narrower or there were direct conflicts

21  between what we're -- like a bus station, for example, at Palm

22  and Del Monte, we were not able to necessarily keep the tracks.

23  We had to remove those in order to build the transit station.

24       Another location was underneath the highway just south of

25  Palm and Del Monte where the corridor is a little bit narrower,

1  and there are highway abutments that, you know, and support

2  structures that need to be avoided.

3      So we were always going to have to remove that trackage

4  anyway.

5      So I hope that answered your question.  Maybe do it over

6  again for me so I make sure it's complete.

7  **Q.**  I think you did, but I do have a follow-up question.

8      So what is the deadline for the critical path item of the

9  track removal?

10 **A.**  The deadline is early September.

11 **Q.**  Okay.  And what will happen if that critical path deadline

12 is missed?

13 **A.**  Well, for each day that we're not able to do that, we're

14 not moving forward with the project.  I mean, the whole -- the

15 project in and of itself is the busway.  We're trying to get

16 public transit riders through Highway 1 traffic faster and

17 provide more reliable transit service to them.  So if the

18 tracks aren't removed, we can't move forward with the project.

19 **Q.**  All right.  And is it true that but for the handcars'

20 operation on those tracks at this point, they would already

21 have been removed?

22 **A.**  In the area of Palm and Del Monte in the city of Marina,

23 yes, they would have been removed and we would be well on our

24 way in, you know, construction.  Remember in my testimony

25 earlier, we had permission from the City of Marina in that

1  public improvement agreement as of November 15th to be able to

2  start work.  But for the injunction on not moving forward, we

3  couldn't really start work.

4  **Q.**   Okay.  And just as a general proposition, is it common in

5  construction projects to make changes to what's being done

6  based on conditions on the ground?

7  **A.**   All the time.

8  **Q.**   And sometimes that includes doing things ahead of

9  schedule, true?

10  **A.**   That is true.

11  **Q.**   And why is that?

12  **A.**   Well, when a public agency is responsible as a fiduciary

13  matter for delivering a project on time and within budget we

14  have to make sure that our team is flexible, can adapt to

15  changes and to evolve as the project moves forward.  You know,

16  without, you know, the amount of time that we need to be able

17  to do the work in the city of Marina, you know, that's going to

18  have to be tacked on somewhere else potentially involving

19  overtime for the contractor to deliver work and accelerate a

20  schedule when they wouldn't necessarily need to.

21          **MS. MILLS:**  All right.  I have no further questions.

22  Thank you, Your Honor.

23          **THE COURT:**  Thank you.

24                          Examination

25  **BY THE COURT**

1   Q.   Let me follow up on a question or two which Ms. Mills had

2   asked you focusing on the critical path conversation you just

3   had with her and the removal of the railroad tracks.

4        You had said the deadline is early September.  When in

5   early September?

6   A.   September 9th.

7   Q.   And is that the deadline to begin the removal of the

8   railroad tracks or to complete?

9   A.   That's the deadline to begin.

10       So what needs to happen is it's -- in the schedule it's

11  noted as pioneer access.  What needs to happen, because the

12  railroad tracks are located in one location, we need to put a

13  gravel road right next to it in order for the trucks from the

14  track removal company to be able to access the tracks along the

15  rail corridor so they can pull out the steel from the railroad

16  tracks, put it on the trucks and then haul it.

17  Q.   How long is it expected that the amount of track which is

18  overlapping with the museum, how long is that expected to take?

19  Because let's assume the gravel's down, but just the actual

20  removal of those tracks.

21  A.   So the schedule as I recall shows from September through

22  November-December time frame.  So it is an extensive amount of

23  work.

24  Q.   Okay.  And that is the construction schedule which needs

25  to be referenced from.  If I were to look for that exhibit?

1    **A.**    As I recall, it's the 4/23 schedule.

2            **THE COURT:**  Thank you.

3        Okay.  Thank you, Ms. Mills.

4            **MS. MILLS:**  Thank you, Your Honor.

5            **THE COURT:**  Mr. Gentry, any brief follow-up?

6    Because -- very brief?

7            **MR. GENTRY:**  Yeah, just a couple.

8                    **REDIRECT EXAMINATION**

9    BY MR. GENTRY

10   **Q.**   So you testified in response to a question that Ms. Mills

11   asked you that construction could start in the city of Marina

12   today or tomorrow if the plaintiff were not still out there,

13   correct?

14   **A.**    Yes.

15   **Q.**   Okay.  But I also thought you testified when I was asking

16   you some questions that the prime contractor, GraniteRock-

17   Myers, still had not obtained all of its items of insurance,

18   its bonds, those things, and that it was still in the process

19   of submitting those things which are necessary preconditions

20   for it to start work on the project.  So I'm trying to

21   reconcile the difference between those two assertions.

22   **A.**    I think maybe what you're getting at is today, meaning an

23   actual today, obviously we would have to have the submittals

24   completed, but we could start shortly thereafter.  Today,

25   meaning, you know, imminently.

RHEINHEIMER - REDIRECT / GENTRY

1    **Q.**   Okay.

2    **A.**   Within the next week or two.

3    **Q.**   So not actually today --

4    **A.**   Not actually today.

5    **Q.**   -- because those submittals are still in process?

6    **A.**   Yes.

7    **Q.**   Okay.  And isn't the same thing true with respect to the

8    U.S. Fish and Wildlife biological opinion, where they still

9    need to sign off on that updated aspect of it so that aspect of

10   the permit is it's greenlight to go forward?

11   **A.**   Right.  So as I explained before, the area within the city

12   of Marina where the handcars currently are -- have their ticket

13   booth and the area up to the highway is clear from an

14   environmental perspective, we would not need to have any

15   further biological opinion clearances necessarily in that area

16   because we've already done the seed collection for the Monterey

17   spineflower.  There's nothing there that's stopping us but for

18   the handcar continued use of the railroad tracks.

19            **MR. GENTRY:**  Okay.  That's all I have for now.

20            **THE COURT:**  Thank you.

21       Thank you very much.  You are excused.

22            **THE WITNESS:**  Okay.  Thank you.

23            **THE COURT:**  All right.  Counsel, let's take a quick

24   five-minute, six-minute stretch break, and then we're going to

25   begin argument.  So we are now in recess.

 1          (A recess was taken from 11:46 a.m. to 12:00 p.m.)

 2          **THE COURT:**  You may be seated.

 3      All right.  We're continuing on the record in the Museum

 4  of Handcar Technology versus Transportation Agency of Monterey

 5  County.

 6      So, counsel, I had set the expectation that we take one

 7  more break at the end of argument, but given the hour and time,

 8  I'm inclined to push straight through.  So we're going to have

 9  25 minutes per side in terms of the argument beginning with the

10  moving party, Ms. Mills.

11      Ms. Mills, do you want to save a little time for rebuttal?

12  Just let me know, we'll give you a heads up.

13      And outside of that, we're going to aim to try to wrap up

14  by 1:00 just for the court reporter, who is in, I believe,

15  Arkansas and otherwise.  So we'll go from there.

16      Ms. Mills.

17          **MS. MILLS:**  Thank you, Your Honor.

18      And I would like to reserve some time for rebuttal,

19  please.

20          **THE COURT:**  Five minutes?

21          **MS. MILLS:**  That will be fine, thank you.

22          **THE COURT:**  Okay.

23                        **CLOSING ARGUMENT**

24          **MS. MILLS:**  So I think that what we need to keep in

25  mind here is it was never a matter of if the handcar tours

1  would have to leave the public land, it was a matter of when.

2  And it is beyond dispute that on October 31st, 2024, Handcar's

3  lease expired, and the lease itself that we haven't talked a

4  lot about here today but was discussed in previous papers

5  referenced that at some point the plaintiffs would need to

6  vacate the property because specifically for the reason that

7  this $105 million transportation project was set to begin.

8      I think that it is beyond dispute that the First Amendment

9  does not create the right to a lease of property in perpetuity,

10  and the plaintiff is suggesting that the TAMC did not renew its

11  lease because of its opposition to the SURF! project.  The

12  moving party does not concede that to be reality.  For purposes

13  of this motion, we are not going to argue that fact.

14      So instead, I'd like to point out that even assuming

15  that the plaintiff has made a colorable First Amendment

16  claim --

17          THE COURT:  Well, the Court found that it had, in

18  fact.

19          MS. MILLS:  Of course.

20          THE COURT:  The Supreme Court found that there is a

21  likelihood of success.

22          MS. MILLS:  Yes.

23      So even assuming that the plaintiff has made a viable

24  First Amendment claim and has shown irreparable harm, under the

25  *Winter* factors, the remaining *Winter* factors, they favor

1   vacating the injunction.  And that would be, of course, the

2   balance of the equities and the public interest of -- that are

3   set forth in the *Winter* factors.

4        And I think that it is without question that this is a

5   project of great value to the public, to help people, lower

6   income people, get to work, people of all means get to work, to

7   aid, to ease congestion.  And a lot of work has been put into

8   this project to get it to the point where we are now and when

9   it's set to begin.

10       And the TAMC has a fiduciary duty to the voters and to the

11  public to get this project done and to get it done on time and

12  within budget.  And I believe that the evidence that has been

13  presented both in the papers and here today in court shows that

14  the continued presence of the handcars on the tracks is truly

15  putting into jeopardy the ability of the TAMC, the MST and for

16  the project to actually be effectuated at significant cost to

17  the taxpayers.

18           **THE COURT:**  So Ms. Mills, let's go to the point of

19  the timing.  And so the tracks, it appears that the track

20  construction removal would begin on September 9th in terms of

21  the laying the ground, literally laying the ground for that to

22  happen, right?

23       And so the other two things that were raised were the seed

24  and soil --

25           **MS. MILLS:**  Yes.

1        **THE COURT:**  -- and the tree removal.

2        **MS. MILLS:**  Yes.

3        **THE COURT:**  So the record also I think is clear at

4   this point that the MST and TAMC have made no effort to try to

5   collaborate or coordinate with the museum regarding possible

6   entry into the property and coordination of that.  What

7   should -- how should the Court consider that in its

8   determination?

9        **MS. MILLS:**  Well, this was set forth in the original

10  moving papers, but there's an issue regarding the removal of

11  the trees on the tracks that goes beyond not having access

12  through the gate because the problem is they -- ideally, the

13  tracks would be gone, and they wouldn't have to worry about

14  damaging the tracks in order to remove the trees because

15  there's heavy equipment.

16       **THE COURT:**  Well, we're down to one tree, so let's

17  talk about that tree.  And it seems like ... so with that tree,

18  so you're talking about the concern about going over the

19  tracks, and then I saw the museum disputed that and said, well,

20  you could do this and you could do that, but, I mean, are there

21  means in which -- let's go back to what I was saying of like

22  should -- how should the Court consider the fact that there

23  have been no efforts made in terms of coordination, and let's

24  start more simply, maybe with the seed and soil removal, then,

25  or sampling.

1          **MS. MILLS:**  Okay.  Well, with respect to the seed and

2     soil removal, there really -- TAMC and MST feels hamstrung, for

3     lack of a better word, because of the injunction.  They don't

4     want to violate the injunction.  They're trying to comply with

5     the injunction.  So their solution has been to just do the seed

6     collection on Tuesdays and Wednesdays, when the handcars are

7     not operating.

8          By way of background, I think it's evident in the papers

9     that there has been -- it's not a matter that the TAMC or the

10    MST doesn't want to cooperate with the plaintiffs.  It's that

11    they're afraid of violating a court order and the injunction.

12    They don't want to do anything that would violate the

13    injunction.

14         So, for instance, you know, they didn't move the heavy

15    equipment over the tracks to remove the tree because they

16    didn't want to damage the tracks and risk violating their

17    possession of the property.

18         In terms of coordinating with the TAM -- I'm sorry, with

19    the handcars regarding the seed collection, I'm not sure what

20    the answer would be because the people have to be on the ground

21    in the tracks removing the seeds with tweezers at some times.

22    And so the only remedy is for them to do it on Tuesdays and

23    Wednesdays when they're not operating because it's not safe for

24    them to be on the tracks when the handcars are operating.

25         I know plaintiff's counsel -- I'm sorry, plaintiff set

 1   forth in their opposition that the handcars only operate

 2   10 miles an hour, but that would be very dangerous if it hit

 3   someone in the head who was on the track.  So I don't think

 4   that it's they're not trying to cooperate.  They've already

 5   changed the entire construction project to try to get as much

 6   done as possible while the injunction is in place.  It's just

 7   as a practicality there is no compromise that's feasible that

 8   wouldn't -- that wouldn't endanger the biologists, but also

 9   potentially endanger the customers on the handcars if there was

10   an accident.

11        And then there's the liability issues for the TAMC and the

12   MST if something were to happen during that, you know,

13   loggerheads of people trying to do things at cross purposes.

14        So I don't know if that answers your question.

15             THE COURT:  You can continue.

16             MS. MILLS:  All right.  So I think there's something

17   that needs to also -- it's set forth in our papers, in our

18   moving papers, but the sequencing of work on a construction

19   site like we discussed with Ms. Rheinheimer is fluid based on

20   the conditions on the ground or what needs to be done, and

21   there's nothing nefarious about that.  But the other thing that

22   needs to be kept in mind is that the sequencing of the work is

23   actually up to the contractor.  It's not just up to -- well,

24   it's not up to the MST or the TAMC.  That's the contractor's

25   job.

**CLOSING ARGUMENT / MILLS**

1      The construction manager's job is to sequence the work in

2  order for it to be the most effective.

3      So I think that's something that we need to keep in mind

4  when we're considering what's going on here with the

5  accommodations that have been made already and what could

6  possibly be done going forward.

7      This critical path issue is, really, we've gotten to --

8  you pointed out the deadline of September 9th, and that's the

9  critical path deadline when it has to begin in order for the

10 construction project to have any -- well, in order for the

11 construction project to finish on time within the 707 days that

12 it takes based on the schedule.

13      That's not the ideal date.  They want to start now.  And

14 so I just want to point out that the MST has already been

15 making accommodations in order to work around the injunction to

16 allow plaintiff to continue to enjoy their tenancy on the

17 property.  And so though September 9th is the drop dead date,

18 it's not the ideal date.

19      And as Ms. Rheinheimer was intimating, things are often

20 done earlier on construction projects.  That's -- in this

21 particular case that's who you can get ahead when you end up

22 with delays later because obviously every delay is cost to the

23 taxpayer.  And there's just simply no way around it.  The

24 tracks have to be removed, and this was always anticipated, and

25 we've just gotten to the point it has to be done.

1    There was talk earlier about the seed collection needing

2    to remove the tracks, but it appears we've worked around that

3    issue at this point, but it has to be removed in order to

4    comply with the design change by the Coastal Commission as to

5    how the project has to be designed.

6    The other thing I would like to point out, I want to talk

7    a little bit about the *Younger* abstention, and I would

8    respectfully suggest that this is an appropriate case for

9    *Younger* abstention.  I would respectfully maintain that under

10   the Ninth Circuit four-part test that *Younger* applies because

11   the UD action is ongoing, it involves California's interest in

12   enforcing the orders and judgments of the courts, it implicates

13   an important state interest, and it allows the litigants to

14   raise federal challenges.

15   I know that in their opposition plaintiffs dispute whether

16   the Younger factors have been met, but I would respectfully

17   disagree.  I think there's no question that on criterion 1, the

18   state proceedings commenced before any federal substantive

19   proceedings.

20   So under the *Equity Lifestyle* case, which is 548 F.3d

21   1184, at 1196, that first criterion is met.

22   I think there's no --

23   **THE COURT:**  Ms. Mills, I think the *Younger* abstention

24   argument is tough given the fact that a stipulation has been

25   signed in state court, signed by the parties, which basically

1    says, which basically is the state court saying, we defer to

2    you.  Like the federal court, you should resolve this

3    injunction and such, and then.

4        So those issues of federalism and comity have been

5    addressed to a large extent already by what the parties

6    themselves entered into.  So I'm having a very hard time seeing

7    the applicability of the abstention doctrines and where it

8    would take you in this case.

9        **MS. MILLS:**  Well, I would suggest that -- I would

10    point out that the stipulation itself reserves all defenses,

11    rights and defenses, and *Younger* abstention is a defense.  If

12    can be brought at any time because it's akin to lack of subject

13    matter jurisdiction or a defect in subject matter jurisdiction.

14        So I would respectfully suggest that the stipulation does

15    not alter the Younger factors.

16        If the Court -- just quickly with respect to the remaining

17    Younger factors, there's no question that criterion 3 is met.

18    I don't think plaintiff would even dispute that.  There's a

19    public interest in this construction project.  And criterion 4,

20    there's no question that the plaintiff had the ability to raise

21    its federal claims at the state level.  Plaintiff argues in its

22    opposition that it wasn't permitted to do so because the Court

23    granted the motion to strike, but *Younger* doesn't say that it

24    has to win on its federal claims, only that the Court has the

25    ability to consider it.  And the Court did consider it, the

 1    First Amendment claim, and struck them.

 2         And then as to criterion~--- the second criterion, which is

 3    that it involves a -- California's interest in enforcing the

 4    orders and judgments of a court, I think that the second

 5    Younger criterion also favors abstention.  It applies to civil

 6    cases involving a state's interest in enforcing a order and

 7    judgments of its court, and this prevents state defendants from

 8    using federal proceedings to render state judgments mandatory.

 9         I think that it doesn't take a great leap in logic to see

10    how it -- this process could be imitated by others in the

11    future who opposed state-funded projects.  It's not uncommon

12    for individuals to disagree or have disagreements with a

13    state-funded project, and if *Younger* abstention were not

14    applied in this case, it would give people a roadmap as to how

15    to prevent construction projects or any projects that they

16    don't agree with from going forward.

17         **THE COURT:**  Only if they make a colorable claim that

18    there was retaliation, correct?

19         **MS. MILLS:**  Yes.

20         **THE COURT:**  Okay.  So I'm going to encourage, because

21    I really, like we're in the weeds right now with the project.

22    So I really encourage, like -- well, weeds or seeds.  But let's

23    really try to focus on this because, I mean, assuming that the

24    Court were to agree with you that the balance of the equities

25    may be shifting or have shifted at some point, you know, it

1  then becomes the question of somewhat timing and so forth, and

2  I'm not sure that whether or not defendant has made that

3  showing in terms of when that shift would happen in terms of

4  when that balance would tip the other way.

5      So I think focusing more in terms of where we are at with

6  the project or anything else that you want raise, or you can

7  reserve and save the remaining time, because you're already

8  well over 15 minutes in, if you want to hear what Mr. Gentry's

9  going to raise.  But I would just focus on that versus the

10  abstention because it seems like that's a bit of a sideshow.

11      **MS. MILLS:**  Okay.  Well, I will just say this.  I

12  keep bringing up this date of September 9th, 2025, which is

13  when the tracks have to be pulled up.

14      **THE COURT:**  Okay.

15      **MS. MILLS:**  I think there's no question that the

16  burden shifts at that point.  I believe the burden has already

17  shifted based on what the TAMC and MST is having to do in

18  order to accommodate their operations on~-- in a construction

19  zone.

20      **THE COURT:**  Okay.

21      **MS. MILLS:**  But if there's no question at that point

22  that the burden has shifted, and there has -- there has to be

23  some time allotted for the plaintiffs to get off the property.

24  They're still selling tickets through August.

25      And as we pointed out in our papers, to not belabor the

1  point, I don't think that the schedule they suggested for the

2  amount of time that it would take them to remove their

3  operations is credible, but if we take them at their word, it

4  takes two months, and it's almost July.  So it would need to be

5  now if the Court is inclined to vacate the injunction.

6          **THE COURT:**  Thank you.

7          **MS. MILLS:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  Mr. Gentry.

9                          <u>**CLOSING ARGUMENT**</u>

10         **MR. GENTRY:**  So, Your Honor, we're here today because

11  the transportation agency for Monterey County is asking the

12  Court to either reconsider or vacate its order granting in part

13  plaintiff's motion for preliminary injunction.

14     TAMC runs into a problem, however, because it fails to

15  demonstrate that it is entitled to the relief requested on both

16  fronts.

17     So first with respect to TAMC's motion for

18  reconsideration, and I'm going to kind of refer to them both as

19  separate motions, although they were combined into one filing.

20  I think it's fair to say that it was a combined motion for lack

21  of a better way to put it.

22     But as to the aspect of it asking the Court to reconsider

23  its order, TAMC failed to first request leave from the Court to

24  file such a motion in accordance with civil Local Rule 7-9.

25  Even if the Court were to construe TAMC's motion as one

 1  requesting leave to file a motion for reconsideration, it would

 2  still fail to pass muster in that regard because TAMC does not

 3  demonstrate a material difference in facts or law from that

 4  which was presented to the Court in the first hearing, does not

 5  demonstrate the emergence of new material facts or a change in

 6  the law, and does not demonstrate any failure by the Court to

 7  consider material facts or dispositive legal arguments that

 8  were presented to the Court before the order was entered.

 9      That's the criteria set forth in civil Local Rule 7-9 for

10  when a court should grant leave or is empowered to grant leave

11  to file a motion for reconsideration.

12      **THE COURT:**  So we were toying with this, because I

13  actually think this is a motion to vacate our a motion for

14  dissolution more than it is about the reconsideration, but the

15  local rule has some.

16      The second basis is a bit, I don't know, I fully agree

17  with our local rule in that aspect, but let's assume that the

18  first and the third are not applicable, right; that TAMC's not

19  arguing that I made an error as a matter of law.  Maybe you

20  are, but I'm assuming that you're not, or that the first one

21  does not apply either.  So we're really looking at that second

22  one.  Let me just pull up the standard so I'm not being so

23  vague on the record.

24      But this new material fact or the equivalent or change of

25  law, and I think what they're going to say is the material

 1   facts are basically now we're looking at this critical path,

 2   we're looking at September.  Seeds and soil and the trees were

 3   all part of the initial papers, but that they've gotten better,

 4   a better sense of their schedule and such.  And so why don't

 5   you focus your argument in terms of that.

 6        But I also, which I meant to ask TAMC, but I'm going to

 7   basically ask them whether or not this is truly just a motion

 8   for dissolution as the Court violated its ruling, which I think

 9   it probably is.

10        **MR. GENTRY:**  Right.  So, to the extent that TAMC is

11   just arguing there is a material difference in fact, I would

12   argue that they failed to meet their burden in that regard.

13   They are not in a materially different position now than they

14   were back in February when they were arguing against the

15   injunction in the first go-around.  They still are -- maybe

16   they're a little closer to being ready to actually start

17   construction, but they're still not quite there.  They still

18   don't have the general contractor having obtained all of its

19   bonds and insurance policies that it's required to have under

20   the contract.

21        And this is an important thing to keep in mind because the

22   contract, you know, all approximately 300 pages of it, has

23   about, let's see, has about six pages, five or six pages of

24   insurance and bonding requirements.

25        We have a performance bond, the payment bond, a warranty

1   bond.  Then we have commercial liability insurance, workers'

2   comp and employer's liability insurance, automobile liability

3   insurance, excess liability insurance, professional liability

4   insurance, builder's risk, contractor's pollution liability

5   insurance.

6       So the fact that the contractor still is in the process of

7   obtaining these submittals definitely means that regardless of

8   Ms. Rheinheimer's assertion that construction is ready to start

9   today, it definitely isn't.  And we also understood or came to

10  understand that MST's understanding of the word "today" is

11  different than the ordinary meaning.  Their understanding of

12  the word "today" is possibly sometime within the next couple

13  weeks, not today.

14      So it's important to keep these things in mind just

15  because MST and TAMC rushed into court.  They filed an

16  emergency motion to advance the hearing date on their motion to

17  vacate the injunction, and it's clear that they still are not

18  ready to actually start construction anyway.  They have yet to

19  meet all of the prior-to-construction conditions established by

20  the Coastal Commission.  They have yet to work out all the

21  details on the U.S. Fish and Wildlife biological opinion.  They

22  may be closer to having conditions ready to actually start in

23  Sand City.  It appears there's still some transportation and --

24  I'm sorry, some traffic control issues that need to be worked

25  out there.

1          THE COURT:  Uh-huh.

2          MR. GENTRY:  But I would respectfully submit that the

3    same thing is likely true with respect to the City of Marina.

4    TAMC and MST have not shown that they have met all the traffic

5    control problems or that they've addressed all the traffic

6    control problems they've been encountering in the city of

7    Marina.

8          So I think the Court established a fairly user-friendly

9    order when it entered that preliminary injunction.  It didn't

10    give the museum everything that it wanted.  It set up a pretty

11    clear path where once TAMC and MST were actually ready to start

12    construction, they can come forward with a detailed evidentiary

13    showing that they had everything that was needed to actually

14    start construction.  They have not done that.

15          Something along those lines would probably include all of

16    the exhibits to the construction contract rather than just the

17    construction contract itself, which was signed I think several

18    days after plaintiff had pointed out in its opposition to their

19    motion that there was no signed copy of the construction

20    contract submitted with it.

21          Their motion would have a copy of MST's budget that

22    possibly is more complete and up to date than the budget

23    submitted to the Federal Transit Administration, and which

24    includes apparently according to Ms. Rheinheimer detail as to

25    the cost of the retainer walls that will need to be put in.

1    Possibly MST's budget includes the estimated cost of trucking

2    out the ballast material, crushing it and bringing it back to

3    put it in as the foundation for the road.  But we don't know

4    that because MST's budget was not included as an exhibit to

5    Ms. Rheinheimer's declaration.

6         So we're left to kind of guess as to where MST and TAMC

7    actually are in the process and we're just asked to take their

8    word for it.

9         **THE COURT:**  So let's say the Court agrees with you

10   that there's -- I mean, there's a balance being reached, right?

11   You all aren't ... the goal of this injunction is not to turn

12   plaintiffs into sort of the supervisors of like looking through

13   and making sure every single part of this very large deal that

14   every "I" is dotted and every "T" is crossed, but -- so, but I

15   do agree with you that why weren't there complete versions

16   provided of the contract and so forth.

17        But let's go beyond that.  Let's say maybe some of these

18   permits are a couple weeks -- that today is not today, that

19   there's definitely a few more weeks in the mix.  But talk to me

20   about that critical path, the September 9th date and the

21   concerns with the tracks themselves, and that date, which, you

22   know, has been in the mix concretely both in testimony today as

23   well as in the record, why is that date in terms of this

24   project moving forward and in terms of balancing the equities

25   not a tipping point?

1        MR. GENTRY:  It's a good question.  If we're

2   talking --

3        THE COURT:  Thank you.  Well, thank you.  So ...

4        MR. GENTRY:  Yeah, I -- if we're talking about the

5   actual timeframe for removal of the track overall, I think it's

6   important to keep in mind that even that projection, that

7   projected timeframe has shifted in the different schedules.

8        THE COURT:  Uh-huh.

9        MR. GENTRY:  The copy of the March 18th of 2025

10  schedule that was attached to Mr. Clark's declaration, I think

11  it was exhibit G to Mr. Clark's declaration, that showed

12  traffic removal starting on or around October 8th of 2025.

13  So --

14        THE COURT:  Is that the latest you saw?

15        MR. GENTRY:  That's the one from March of 2025.

16        THE COURT:  Is that the latest date you saw -- sorry,

17  the latest date for the track removal which you saw in terms of

18  the versions you have seen?

19        MR. GENTRY:  In the March, the March 18th of 2025,

20  schedule, that is the latest date for track removal to start.

21  That track removal date moves up about a month to September 9th

22  of 2025 in the April 23rd, 2025, version of the schedule.  So

23  it advances a little bit.  But as far as the general concept of

24  track removal, we're looking at the fall of 2025 in virtually

25  every iteration of the schedule.

1           **THE COURT:**  And do you agree that that is a

2    critical -- we're just going to use this buzzword for the

3    purposes of today, but critical path, is that the ...

4           **MR. GENTRY:**  I would agree, with the caveat that I

5    think the Court and the plaintiff should maintain a degree of

6    skepticism as to TAMC and MST's representations about exactly

7    where they are in that process and what is ready to start at

8    any particular given point in time.

9         And the other point to make, September of 2025 is about

10   three months away.  TAMC was filing its emergency motion saying

11   we need to be able to start construction before the end of May,

12   last month.

13          **THE COURT:**  Well, let's not forget the motions at the

14   ex parte request to shorten, the request to shorten time.

15          **MR. GENTRY:**  Right.  And asking to shorten time when

16   their actual timeframe when they really need to get things

17   done -- again, taking their representations at face value -- is

18   in September of 2025.

19          **THE COURT:**  Discuss the museum's 60 days and need for

20   60 days with me.  I saw the schedule in the Clark, Mr. Clark's

21   declaration, but talk to me through that and whether or not --

22   because you heard, and it was both in the reply brief and

23   otherwise, concern regarding, you know, the 60-day and whether

24   or not it's an overly inflated figure.

25          **MR. GENTRY:**  So I don't think that it's inflated in

1    any way.  I think it accounts for the fact that there are going

2    to be a number of action items that the museum is going to need

3    to undertake in order to get itself out, to take its structures

4    down in the city of Marina, to take out all of the handcars

5    that are being stored there, and, you know, get a crane to take

6    out some of the structures.  There's just a lot of things that

7    need to take place in order for the museum to vacate and do so

8    fully and finally.

9         The other point that I would want to make in that regard

10   is a 60-day timeframe was explicitly built into the lease as

11   the time in which, if the -- and I think it would have been the

12   City of Marina in this instance, but if the city were intending

13   to terminate the sublease between my client and the City, then

14   it would need to provide 60-day notice so that my client can do

15   what it needs to do to vacate the property, have everything

16   ready and get out of there.

17        That 60-day timeframe essentially gives plaintiff the

18   benefit of the bargain so that it's not essentially, again,

19   being prematurely forced out of a lease in retaliation for its

20   exercise of its First Amendment rights.

21        So that's the other point that I would want to make on the

22   60-day timeframe.  And also for at least probably the past six

23   months my client has been kind of operating in a state of

24   uncertainty, right?  You know, that the Court granted the

25   injunction in part, but the unlawful detainer proceeding did go

 1   forward in the sense that the parties stipulated to a judgment,

 2   and once the Court lifts the injunction, then there will be a

 3   fairly short fuse on when my client has to leave.

 4        So a lot of the 60 days has to do with just allowing

 5   plaintiff also the degree of certainty that it would need to

 6   plan out its departure in a way that is orderly and sensible

 7   and doesn't result in, you know, some aspects of personal

 8   property being left behind because it had to leave in a rush or

 9   something like that.

10        So I'll just point out a few more of the things that TAMC

11   would have had as attachments to an exhibit or I'm sorry, a

12   declaration from Ms. Rheinheimer or some other form of

13   authentication.  One of them would be the Caltrans encroachment

14   program.  The schedules, probably all iterations of them

15   identify a Caltrans encroachment permit as a necessary item

16   that needs to be obtained.  We have not seen any evidence

17   anywhere in the record as to TAMC or MST having obtained that

18   Caltrans encroachment permit.

19        So I'd submit if they were actually ready, they would have

20   provided a copy of that.

21            THE COURT:  So I want to make sure I fully understand

22   things which in the museum's mind remain outstanding in terms

23   of permits or otherwise.  Can you just list them in terms of

24   what you had started with earlier and then now anything

25   further?

1      **MR. GENTRY:**  Sure.

2          So there's the Coastal Commission prior-to-construction

3      conditions.  We've been told that they're right around the

4      corner, but we still haven't seen any indication that the

5      Coastal Commission has actually confirmed that the prior-to-

6      construction conditions have been met.

7          **THE COURT:**  Uh-huh.

8          **MR. GENTRY:**  There's the U.S. Fish and Wildlife

9      biological opinion which we understand needs to be updated in

10     some respects, including in relation to the city of Marina,

11     because it does encompass at least in part the city of Marina,

12     and it has not been updated since the significant redesign of

13     the surplus project.

14         There's the Caltrans encroachment permit which deals with

15     I think some rights of way access issues at various points on

16     the busline.

17         And then we've heard representations from, you know,

18     Ms. Rheinheimer that the improvement agreement with the City of

19     Marina is a permit, but it would seem that there should be some

20     more formal sort of permit having been issued by the city

21     before construction can actually begin there.

22         And those are the only -- well, yeah, those are the only

23     permitting issues that the museum is presently --

24         **THE COURT:**  That's helpful, thank you.

25         **MR. GENTRY:**  Yes.

1    So I would also point out, and I think the Court picked up

2  on this, TAMC's motion shows in large part the agency is more

3  interested in identifying problems that can form a factual

4  basis for its argument to vacate the injunction than it is at

5  actually finding practical solutions to those alleged problems.

6  And the issue with seed collection is a prime example.  It's

7  fairly clear that neither MST nor TAMC made any efforts to

8  try to work with the museum to figure out a way that its

9  biologists can go out on the tracks or near the tracks and

10 collect seeds.

11    It's I think also pretty clear from the record, and we

12 tried to make it clear, that the plaintiff is willing to

13 cooperate.  Has no problem.

14    **THE COURT:**  And has there been any outreach?  Because

15 I do think your record is pretty clear.  I mean, those

16 statements were made in your opposition papers and the

17 willingness was expressed.

18    Has there been any efforts since the motion papers?

19    **MR. GENTRY:**  Not aware of any.

20    Yeah, and the other point that I would want to make on

21 that is there's really a complete absence of evidence that TAMC

22 investigated to what extent it's possible to work around the

23 museum's operations other than, you know, doing the seed

24 collection on Tuesdays and Wednesdays, which by all measures

25 seems to be working okay.

1    THE COURT:  Uh-huh.

2    MR. GENTRY:  The issue of the museum's liability

3  insurance is another area where TAMC seems more interested in

4  identifying a problem to support its legal arguments before the

5  Court rather than actually addressing a real world issue.  TAMC

6  filed a copy of an outdated certificate of liability insurance

7  to imply that the museum may not be properly insured.

8    THE COURT:  No, I thought that was unfocused.  I

9  agree.

10    MR. GENTRY:  Right.  And it was also filed along with

11  another probably six, seven, eight different items of evidence

12  with their reply for the first time and not in rebuttal to any

13  specific argument.

14    And to be clear, if TAMC or MST had made an inquiry as to

15  whether the plaintiff has a current liability insurance policy,

16  the answer would have been "yes," and TAMC has been added as an

17  additional insured, and my client, I'm sure, would be happy to

18  add MST as an additional insured.

19    But those conversations, if they never happen, then TAMC

20  will never get the benefit.

21    THE COURT:  There's a tone which is obvious

22  throughout -- which is hinted at both throughout the papers and

23  throughout the exhibits that I think stepping back from the

24  personal level, interpersonal level which has been reached in

25  terms of what is happening in this litigation would behoove

1   everybody involved, and I tend to agree, and it's something

2   we're going to talk about as we look towards the ADR deadline

3   which is coming up, and I agree with your comments, counsel.

4         **MR. GENTRY:**  Let's see.  So we're also seeing what

5   appears to be an attempt on the part of TAMC to manufacture the

6   conditions necessary to remove the museum from the premises.

7   In March of 2025 MST submitted a proposed construction schedule

8   to the Coastal Commission indicating a proposed construction

9   start date of September 2nd, 2025.  This proposed schedule,

10  similar to an earlier version generated on November 11th, 2024,

11  did not have construction starting at the Palm-Del Monte

12  station until 2026.

13        Suddenly, however, after the Court entered its injunction,

14  MST both advanced its start of construction date from

15  September 2nd of 2025, which was the date in that March 2025

16  constructions statement, it advanced that construction start

17  date to May 23rd, 2025 and stated the construction at the Palm

18  Del Monte station would begin on that date.

19        I think it's fair to say that the Court can infer based on

20  the temporal proximity between the date of entry of the

21  injunction on April 14th of 2025 and the generation of that

22  updated construction schedule less than 10 days later, that the

23  advancement of the construction start date and the start of

24  construction at the Palm-Del Monte station were intended

25  primarily to facilitate the modification of the Court's

1    injunction and possibly in order to further retaliate against

2    the museum for its exercise of First Amendment rights.

3        Frankly, I don't think that Ms. Rheinheimer's explanation

4    as to why the construction start date was advanced in the way

5    that it was and why construction was intended to start in the

6    Palm-Del Monte station in May of 2025, I don't think it's

7    credible.  And in large part the reason for that is they were

8    still trying to figure out with their contractor, number one,

9    I'm sure what the contract would look like, because it hadn't

10   been signed by the time that they were representing that they

11   were intending to start construction, and as previously

12   indicated, their contractor is still working on the

13   submittals.

14       THE COURT:  Counsel, you have a minute or two, a

15   couple minutes remaining.

16       MR. GENTRY:  I think the last point that I would make

17   is just that the Court crafted what I think is an elegant

18   solution to a difficult problem in its preliminary injunction.

19   It allowed a lot of flexibility to TAMC and MST to resolve the

20   injunction, to get it modified or get it vacated when they're

21   actually ready, and it also recognized the plaintiff's

22   interests and I think accounted for those fairly well.  TAMC's

23   problem here is that they're just not ready, and if they were

24   ready they would be able to show us.

25       That's all I have, Your Honor.

1          **THE COURT:**  Thank you.

2                    **CLOSING ARGUMENT**

3          **MS. MILLS:**  Just briefly, Your Honor.

4      I would suggest that plaintiff's characterization of the

5  readiness of the project is misstated.  I can only assume it's

6  based on a misunderstanding of how construction projects work.

7  Construction projects do not, on a project of this magnitude,

8  they are not organized in such a way that every single permit

9  contingency is completed before the project actually is

10 underway, or no construction project would ever be

11 completed.

12     I think this is reflected in the schedule that plaintiff,

13 Mr. Clark, put forth for leaving, vacating the premises where

14 everything has to be done consecutively, as opposed to things

15 being done concurrently.  And I think there seems to be a

16 disconnect here.

17     There was no evidence that was intentionally withheld from

18 this Court in order to obfuscate or to mislead the Court in any

19 way.  We provided a mountain of evidence.  We provided

20 everything that we thought was relevant on a short timeline,

21 and if there's anything that is missing, which I would suggest

22 based on the evidence that's been presented, we have more than

23 met the Court's suggestion of what the burden is to show that

24 we are ready to begin construction, but if --

25          **THE COURT:**  Ms. Mills, why didn't TAMC include the

1   complete version of the contract with the -- with all the

2   attachments?

3        MS. MILLS:  I can only -- it was not intentional.  It

4   was a process, a function of having so many exhibits that

5   somebody dropped the ball somewhere.  I didn't realize until we

6   were here today that that was the case.  I honestly did not,

7   Your Honor.  And if that were the deciding factor, there's

8   nothing in those attachments that changes anything that's going

9   on here.

10       And I think that --

11       THE COURT:  What I'm hearing is it was a shortened

12  timeframe, but this is somewhat -- the shortened timeframes,

13  which have been happening ever since the motion to shorten time

14  on this motion, were of TAMC's own making, right?  I mean, the

15  initial preliminary injunction papers which the Court granted

16  leave then to supplement those papers had no evidence.  Like

17  all these fire drill emergencies keep being of TAMC's own

18  making to some degree.  Which, from the perspective of judicial

19  economy and for us to actually have to review these records and

20  be here again on another motion, so is a little bit -- it's

21  wasteful of the judicial resources and public trust in terms of

22  that.

23       MS. MILLS:  Your Honor, I heed what the Court is

24  saying.  I do not disagree at all what the Court is saying.  I

25  cannot speak for prior counsel and why things were done the way

1    that they were done.  I'm not going to throw prior counsel

2    under the bus, but from my perspective, as soon as I have had

3    this case, I had to deal with the injunction being granted and

4    trying to get up to speed and trying to provide the Court the

5    actual information that the Court said it needed to set aside

6    or vacate or modify the injunction.  I understand the Court's

7    concern, I do.

8        I can't speak for why other people did other things

9    differently.

10        So I don't know what -- I'm sorry, Your Honor, I don't

11   know what else to say other than that.  We've tried to be

12   respectful of the Court's time, and this is a very difficult

13   situation.  Plaintiff's counsel just stated that his client is

14   operating in a state of uncertainty.  Well, so is the MST and

15   the TAMC.  I mean that's why there was this provision in the

16   lease in the beginning that they -- that the lease was going to

17   be terminated or not renewed.  Not terminated; not renewed at

18   some point.  Because they did not want someone operating in a

19   construction zone because it's not conducive to an efficient

20   construction project.  Otherwise, they would just love to

21   collect more money I'm sure if it weren't a burden, but that's

22   the reality of the situation and why the contract was written

23   the way that it was.

24        And I'm not going to argue those points about the First

25   Amendment issue because I said I wasn't going to, and I'm going

1  to focus on the burdens, but I think there's no question that

2  we've gotten to the point where the public interest and the

3  burdens on the -- the balance of the equities in the public

4  interest on the *Winter* factors inure to vacating the

5  injunction.

6      THE COURT:  Do you agree with the Court's analysis

7  that this is, in fact, a motion to vacate or dissolve the

8  injunction more so than it is a motion for reconsideration?

9      MS. MILLS:  I would say that, yes, it is more so a

10  motion to vacate rather than a motion for reconsideration.

11      THE COURT:  So would you agree with the Court in its

12  analysis that its order, written order, was falling under that

13  versus ... I mean, following under the motion to vacate --

14      MS. MILLS:  Yes, Your Honor.

15      THE COURT:  Okay.  It seems like we all kinda think

16  that, so I just wanted to confirm on the record that we all do

17  think that makes more sense.

18      MS. MILLS:  Your Honor, it does.  It was a belt and

19  suspenders kind of ...

20      THE COURT:  Yes.

21      MS. MILLS:  The other thing I wanted to point out was

22  I think that the safety concerns of having this operation going

23  on while construction is going on are being downplayed.  It's a

24  construction zone.  Construction zones are dangerous.  And

25  there's no amount of cooperation that is going to ameliorate

1    those concerns.

2         There seems to be some suggestion that the insurance, the

3    insurance bonds are not going to be obtained.  Again this is

4    common in a construction project that things are done on a

5    rolling basis.  And those have actually already been

6    previously negotiated.  It's just a matter of them~--- the final

7    issuance.

8         There was talk about the fact that the construction

9    schedule was changed in order to thwart their business in

10   response to the injunction, and I think if you went back and

11   looked up the March version of the construction schedule, it

12   says that the railroad tracks were going to be removed on

13   September 2nd.  So it's always been anticipated that these

14   tracks have to come up.

15        **THE COURT:**  Let me just confirm, because I was trying

16   to hammer out that fact in my head.

17        So that the removal of the tracks was September 2nd in the

18   March ...

19        **MS. MILLS:**  Yes, in the March version.

20        **THE COURT:**  Because I feel like ...

21        Do you remember what -- well, we can just double-check,

22   but I think that plaintiffs thought something differently

23   than -- I'll just take a look at it, the exhibit.

24        **MS. MILLS:**  All right.  I think that there's a lot of

25   hypothesizing going on here, and testimony is evidence.  Some

1    of the things that counsel was raising that he didn't have

2    answers to are questions that he could have asked

3    Ms. Rheinheimer while she was on the stand.

4         And there's no way that the TAMC could possibly anticipate

5    every issue that plaintiff was going to think was an issue when

6    filing its papers.  We produced I fear too much evidence, a

7    volume of evidence, a lot of documents, and we attached

8    everything that we thought was relevant and important.  There's

9    always something else.

10        But it just appears in this case that a line is set, and

11   there has to be more.  Whatever we provide on behalf of the

12   TAMC is never enough, and it's quite apparent it would seem to

13   me based on the record and the testimony before us and the

14   evidence that's in the record that -- in the motions that this

15   construction project is ready to go and it needs to move

16   forward.  Otherwise the entire construction project and the

17   will of the voters is going to be thwarted at great cost to the

18   taxpayers so that plaintiff can operate just a little bit

19   longer.

20        I think unless the Court has more questions, which I'm

21   happy to try to answer.

22        THE COURT:  No, you are exactly at 25 minutes also,

23   so I think you nailed it on the head.

24        MS. MILLS:  Okay.  Thank you, Your Honor.

25        THE COURT:  All right.  Okay.  So the Court is going

1   to take this under submission, as planned, to issue the order

2   within a week, but a little bit of expectation setting just in

3   terms of where my head is sort of leaning at this point.  Well,

4   a few things.

5        One, I'm going to order TAMC to order the transcript on an

6   expedited basis because I think I will need it for the order,

7   and it would be useful.  I notice that there are no transcripts

8   in this case, and given what we've been sort of sorting

9   through, especially in terms of then moving to dissolve a

10  preliminary injunction, that would have been helpful.

11       So Ms. Mills, so my intention is to issue an order within

12  a week, and frankly speaking, I am inclined to grant.  But once

13  again, finding that the hardships are beginning -- the balance

14  of hardships are beginning to tip in favor of defendants.

15  However, with a qualifier, and I'm looking at a certain number

16  of days out somewhere in the range of 60 or so, at least,

17  keeping in mind what the Clarks have set forth in their

18  declaration.

19       And point well taken in terms of the lease and the 60

20  days, as well.

21       As well as the notion of a critical path and looking at

22  the early September date set forth by TAMC.

23       So that's where I'm sort of headed, but I'm only saying

24  that in part because I want Mr. and Mr. Clark to be sort of

25  aware of that generally because this shouldn't be -- I don't

1   want it to be something where you're caught by the seat of your

2   pants, so to speak.

3        On the big picture, I really want to begin to focus

4   counsel and parties on the case and where we're really at.  So

5   the Court found a likelihood of success on the merits on a

6   First Amendment retaliation claim.  That's not anything to be

7   taken lightly.

8        You have an ADR session coming up at the end of September,

9   another ADR deadline.  I don't know if there's been discussion

10  about going back to Judge van Keulen or not or whether or not

11  it's private mediation, but I hope you all have reached out to

12  Judge van Keulen by now because the magistrate judges, their

13  schedules fill up 60 to 90 days in advance for any settlement

14  conferences.

15       Your deadline is the end of September.  Usually it's 90

16  days they fill up.

17       I expect counsel to follow the local rules.  I expect

18  counsel to follow the Court's orders.  I expect not everything

19  needs to be on an expedited basis because most of the time it

20  doesn't.  I expect to have complete records.

21       So moving forward, I think it would behoove everybody to

22  take out a little bit of the personal we've been referring to

23  them as side shows.  It seems like there's sometimes efforts

24  that antagonize or needle, like either in the papers or

25  otherwise.  Not helpful.  I think there's means to work

1    collaboratively to collect seeds.

2        I think there's a means to work collaboratively to -- and

3    to take some of the sting or take some of the personal attacks

4    out.

5        I think that will actually help you in settlement

6    discussions.  I know it's a community and you all are working

7    together in this community.

8        So seeing your Facebook posts.  I've seen ... let's focus

9    on what's best for the community and what will move things

10   along.  Okay?  And that includes counsel, as well, in terms of

11   keeping things -- some of the stuff which does not -- a

12   personal attack in terms of whether or not there was a

13   restraining order, not important for my purposes right now in

14   terms of this analysis.

15       That is my soapbox for this afternoon.

16       Anything else which we need to discuss before we wrap up

17   for today?

18           **MS. MILLS:**  No, Your Honor.

19           **THE COURT:**  Stephen, that was an "I don't think so"

20   from Ms. Mills.  And if there's anything else to address with

21   the Court, please come up.  But otherwise I'm going to say for

22   the record that counsel's heads are shaking no, and so with

23   that I believe we're ready to -- the Court will take this under

24   submission, and we are adjourned for the rest of today.

25       Okay.  Thank you.

1          (Proceedings concluded at 12:57 p.m.)

2                         ---o0o---

3                  **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6     DATE:  Wednesday, June 25, 2025

7

8

9     _____

10         Stephen W. Franklin, RMR, CRR, CPE
           Official Reporter, U.S. District Court
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25